[L. A. No. 29370. In Bank. Nov. 16, 1967.]

HERBERT MARCH, Petitioner, v. COMMITTEE OF BAR EXAMINERS, Respondent.

John T. McTernan for Petitioner.

Kenneth D. McCloskey and John A. Mitchell for Respondent.

THE COURT.—Petitioner, Herbert March, seeks review of the action of the Committee of Bar Examiners in refusing to certify him to this court for admission to practice law in California. (Bus. & Prof. Code, § 6066.)

The committee's refusal is based upon its conclusion that he is not a person of good moral character, as is required for certification under subdivision (c) of section 6060 of the Business and Professions Code, that he has not shown himself possessed of good moral character, has not removed any and all reasonable suspicion concerning his moral fitness, and has not shown himself entitled to the high regard and confidence of the public within the meaning of Rule X, § 101, of the Rules Regulating Admission to Practice Law.[1]

The committee based its conclusion on the following findings: (1) petitioner testified falsely under oath before the House Committee on Un-American Activities (hereinafter called the Dies Committee) in November 1939 when questioned by Congressman Martin Dies; (2) on June 17, 1959, while petitioner was a member of Local 108 of the Sheet Metal Workers International Association he made numerous false statements, not under oath, to a union trial committee and permitted his counsel at that hearing to read from the transcript of his testimony before the Dies Committee; (3) prior to January 1961 and again in March 1961 petitioner mailed an appeal from the union committee's decision to executives of the union and made numerous false statements in this document; (4) petitioner did not mention these matters in May 1961 when he filled out a registration form as a law student, and he answered in the negative question 13(g) asking whether there was any incident of a derogatory nature, not called for by the prior questions on the form, which might

---

[1]Under this rule the burden of proving good moral character is on the applicant, who must initially furnish enough evidence of good moral character to establish a prima facie case, and the committee then has the opportunity to rebut that showing with evidence of bad character.

have some bearing on his character and fitness to practice law; (5) in April 1965 petitioner answered in the negative a similar question on his application for examination and admission to practice law and did not mention the matters related in (1), (2) and (3) above.

This court recently had occasion to set forth the rules relating to the review of proceedings of the type involved here. In *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 450-453 [55 Cal.Rptr. 228, 421 P.2d 76], we stated that the findings of the committee are given great weight but are not binding on this court and that the burden of showing that the findings are not supported by the evidence or that the committee's action is erroneous or unlawful is on the petitioner. This court examines and weighs the evidence and passes upon its sufficiency, and any reasonable doubts are resolved in favor of the petitioner. We stated that the fundamental question to be determined is the same whether the matter at issue relates to an applicant for admission or an attorney upon whom discipline has been imposed: Is the petitioner a fit and proper person to be permitted to practice law, and the answer to this usually turns upon whether he has committed or is likely to continue to commit acts of moral turpitude.

Throughout these proceedings petitioner has freely and frankly admitted that he testified falsely before the Dies Committee and in the union proceedings and that the appeal submitted by him contained false statements. He conceded—indeed, almost insisted—throughout the hearings before the bar examiners that he acted improperly and unjustifiably in making the false statements but asserted with equal vehemence that although he felt he was justified in his conduct at the time he acted, he no longer holds this view and that his study of law contributed significantly to the change in his outlook. Petitioner denies that he attempted to deceive the committee in filling out the forms referred to above.

Initially, we must determine whether petitioner has met the burden of making a prima facie showing of good moral character. He presented to the committee letters from 13 persons attesting to his good moral character. Most of the testimonials were from attorneys and from persons who had known petitioner for 16 to 30 years. Four of the writers were aware of petitioner's misconduct before the Dies Committee and the union trial committee. These 13 letters are overwhelmingly commendatory and speak in the most laudatory

terms of petitioner's moral character and ability. A few excerpts will suffice.

An attorney who had known petitioner for over 30 years and who had been a member of the Illinois bar for more than 45 years wrote that petitioner was a man of unquestioned honesty, integrity and responsibility, and recommended him to the committee unreservedly.

Another attorney, who had known petitioner for 16 years while petitioner was involved in the labor movement wrote, ''I can express without qualification the personal judgment that I have always considered him a person of total personal integrity and honesty, with a very strong sense of responsibility toward the obligations of any position which he held. He worked in the labor movement during a period of great turbulence and wide diversity of opinion, both within and without the labor movement, as to the role and tactics of the labor movement in our society. As an attorney representing a number of unions, . . . I can recall specific occasions when leaders, in his union and in others, holding views sharply at variance with his on matters of union and public policy, have gone out of their way to indicate their great respect for him as an individual and their complete confidence, despite any differences of opinion between them, in his personal honesty and personal commitment to the welfare of the union members whose representation was his responsibility. . . . [I]t would be my firm conclusion that, as an attorney, Mr. March would function with complete honesty and with a firm dedication to the best interests of his clients. I sincerely believe that he would be a credit to the Bar.''

A professor of economics who had known petitioner for 16 years wrote that petitioner was generous and kind, constantly helping others with his time and money, had all the attributes of a good citizen, such as respect for the law and a strong belief in the democratic process, and that he was a man of strong character, honest, dependable, a hard worker, very well self-disciplined and organized, and a thoroughly decent and respectable person.

At the time of the hearings petitioner was employed by a law firm as an investigator and researcher. His employer, an attorney who had known him for seven years and who was aware of the false statements made by him, wrote: ''I am thoroughly convinced of his honesty; I am confident that he will be completely reliable in meeting all of his obligations to his clients and to the courts if he is admitted. . . . He is

personally dedicated to the support of our constitutional form of government and to the achievement of such changes as he believes in through constitutional processes. . . . While Mr. March, of course, wishes to make a living out of the practice of the law, he is much more concerned with using the law as a means of serving the needs of people than he is with any great personal advantage of his own. He sees the law as a means of making our democratic processes work and work effectively.''[2]

Another attorney, who had known petitioner for 24 years and who was also aware of his false statements, wrote, ''In his [petitioner's] work in the Union, he was always ready to place principle and the welfare of the organization ahead of his personal interests. He stuck by his positions when he thought them right, no matter how unpopular they were and many times at personal sacrifice. His approach to the problems of the Union, . . . was always one of seeking a solution which served a broad social or organizational interest. I feel that I can state with confidence that he could be relied upon to place the interest of his clients and the public welfare above any consideration of personal gain, and to serve in what I conceive to be the highest tradition of the Bar.'' He concluded that although his letter was written at the specific request of petitioner's attorney, even if this had not been the case, he would have felt he was rendering a service to the bar by volunteering the judgments expressed therein.

There are other letters, equally commendatory, but it is unnecessary to quote from them in order to demonstrate that petitioner has made the prima facie showing required of him.

Petitioner has led a colorful and controversial life. He played an active role in the earlier, turbulent days of the labor movement, was a member of the Communist Party for many years, and was arrested numerous times in connection with these activities. The committee specifically found that his involvement in the labor movement and the Communist Party and his several arrests did not justify a conclusion that he was unfit for certification; we refer to these matters, therefore, only for the purpose of describing petitioner's background and the context in which his false statements were made.

Petitioner was 54 years old at the time of the hearings before the bar examiners. He had been married for 34 years

[2]It should be noted that the writer of this letter is the partner of the attorney representing petitioner in these proceedings.

and has three children. One son is a nuclear physicist, another was working on his doctorate degree at the time of the hearings, and a third was a university student. Petitioner began the study of law in 1961 at the age of 48, was graduated cum laude from Southwestern University School of Law in 1965, and passed the bar examination given in August of that year.

At the age of 16 he joined the Young Communist League, and left his home in New York shortly thereafter. He went to New Jersey and participated in such activities as organizing relief efforts for the unemployed, encouraging the formation of labor unions, distributing handbills, speaking before groups of unemployed persons, and picketing during strikes. In 1931 petitioner became a district organizer for the League in Kansas City. He organized laborers and the unemployed to seek relief, promoted a campaign to obtain unemployment compensation legislation, and initiated efforts to prevent the execution of two Negroes who had been convicted of murder in southern states after trials lasting a half hour in one case and 20 minutes in the other. He raised money to hire an attorney and to send telegrams to various officials requesting a stay. Ultimately, one of the defendants received only a short jail sentence; the other was executed.

During this period petitioner was arrested several times. With one exception, all of these arrests occurred while he was engaged in such activities as picketing in labor disputes, speaking at or attending street meetings, or distributing handbills.[3]

Petitioner was married in 1932 and moved with his wife to Chicago, where he obtained a job with Armour & Company as a laborer. There, he made efforts to organize the employees into labor unions and served in an executive capacity in the unions after they were formed.

For most of the period between 1937 and 1955 petitioner was employed by the United Packinghouse Workers Union, which he helped to organize, as a field representative, organizer and director. In 1937 he attended a Communist Party training school in New York and became a member of the party; for a three-year period he served on the party's national committee. He testified that during this period he generally evaded answering questions relating to whether he was a member of the Communist Party because he felt this

---

[3] He was arrested at the age of 16 and given a six-month suspended sentence for practicing target shooting with a friend's .22 gun in an open area near his home.

could harm the union, which was under criticism in the press.

At the end of 1938 or early in 1939 he terminated his membership in the Communist Party. He stated he believed his membership in the party might be harmful to the union, that his union activities left him little time for party meetings, and that he was disturbed by the nonaggression pact concluded between Russia and Germany in 1939.

In 1939 the Dies Committee held a hearing in Chicago, and petitioner was summoned as a witness. At the hearing petitioner answered falsely numerous questions put to him by Congressman Dies relating to his affiliation with the Communist Party and the Young Communist League.

When a member of the Committee of Bar Examiners inquired about his motives in testifying falsely before the Dies Committee, petitioner forthrightly stated: ''I want to say that it was absolutely incorrect for me to have given the false answers that I gave under oath, and I should not have done so. It was wrong, and I am not attempting to justify them. I can detail to you what impelled me to do so or my motivation if you are interested, but it certainly won't excuse having done it.''

He stated that he had been advised, prior to the Dies Committee hearing, that the committee was coming to Chicago at the suggestion of the officers of two large packing companies and that the purpose of the invitation was to influence union elections to be conducted by the National Labor Relations Board at one of the packing plants. According to petitioner, the hearings were held two or three days before the scheduled elections, in a hotel room, on a Saturday, in order to enable the Sunday newspapers to relate the testimony elicited, and that he felt the committee was abusing the legislative process under the guise of following a congressional mandate to investigate subversive activities.[4]

[4]The Committee of Bar Examiners states in its brief that petitioner's ''attempts to justify his conduct by an attack upon the Congressman and his reasons for holding the hearing in Chicago'' are belied by the facts that Congressman Dies made a statement in the course of the hearing at which petitioner was examined, to the effect that he was not going to issue a press release and had not done so, that the proceeding was a secret one, and that he was not aware of the pending union election when he decided to hold the hearings. While these matters may be relevant to the state of mind of Congressman Dies they are not relevant to petitioner's state of mind at the time of the hearings. Congressman Dies made these assertions after petitioner had given his false testimony; petitioner's attorney pointed out to the Congressman that the press had learned of the hearings and was publicizing them and that it could not be denied that the fact the hearings were being held was being used by the press to influence the election.

During the years petitioner lived in Chicago he was arrested several times for activities in connection with his union organizational work. He actively participated during this period in many constructive projects. He was a founder of the Back of the Yards Neighborhood Council, an organization which undertook to improve the conditions in a slum area adjacent to the Chicago stockyards, and he held various executive positions on the council for 15 years. This organization assisted in the development of a playground in the area, attempted to combat juvenile delinquency and racial unrest, obtained free milk and hot lunches for the children who lived there, and in cooperation with the Catholic Youth Organization, provided summer camp facilities for children of the packinghouse workers. Petitioner was also active with the Chicago Settlement House, the Stockyards Chamber of Commerce, the National Association of Colored People, the Urban League, the Council of Social Agencies, and the Young Women's Christian Association. He participated actively in political campaigns, and initiated several moves to assist Negro packinghouse workers. For example, he was primarily instrumental in moving the union headquarters to a predominantly Negro area so that the headquarters building could be used as a community center.

Petitioner rejoined the Communist Party in 1942 and remained a member until 1955. In 1952 he was again summoned before the Un-American Activities Committee (a successor of the Dies Committee) and this time refused to answer any questions about his political affiliations on the ground that his answers would tend to incriminate him. In 1948, when he was District Director of the Union, he resigned his position because of the union's resolve to have its officers file non-Communist affidavits in conformity with the Taft-Hartley Act. He became an organizer for one of the union's locals and retained this position until 1955. In that year he resigned from his job with the union, terminated his membership in the Communist Party, and moved to California. He testified that he had strong disagreements over the years with the party over its interference in union affairs, that the party had disciplined him for his independence and refusal to implement its views, and that because he felt his continued association with the party and the union would result in destruction of the union he terminated both associations.

Petitioner joined the Communist Party briefly again in 1956 in Los Angeles after a party official urged that review of

the internal structure of the party was under way and that he could assist it to become a democratic organization. He testified that after a year he became convinced that there was no prospect of the party's adopting a program which could measure up to the realities of life in this country and that the party would not be run on a democratic basis, and in 1957 finally terminated his membership. A detailed statement of petitioner's reasons for leaving the party, written down at the suggestion of his attorney, is contained in the margin.[5]

When petitioner came to California in 1955 he joined a local of the Sheet Metal Workers International Association. In 1959 a trial committee was selected to hear four charges relating to his alleged membership in an organization which advocated the overthrow of the Government. Petitioner was not a member of the party when he joined the union in 1955 and was no longer a member at the time of the trial board hearing. He stated falsely before the trial committee that he had not been a Communist at any time while he was in this state and that he had not attended a certain Communist Party meeting or used a certain alias. Moreover, he permitted another union member who was acting as his trial counsel to read to the union committee portions of the Dies Committee hearing transcript in which petitioner had denied his Communist affiliations. Petitioner admitted before the bar examiners that he was trying to give a false picture to the union trial committee in permitting this testimony to be read but stated that he had not discussed in advance with the person representing him the use of the Dies testimony. This was done when his representative spontaneously referred to a copy of the transcript of the Dies Committee hearing brought to the meeting by the members of the union trial committee.

Petitioner testified before the bar examiners that the trial committee had been previously elected at a rump meeting, not announced to the entire membership of the union, that it was

---

[5]Some of petitioner's reasons for terminating his membership in the Communist Party were that the party structure was bureaucratic, undemocratic and destructive of independent thinking, that he felt there was something wrong with a party which was so organized that the commission of Stalin's crimes was possible over a prolonged period, that the party interfered in an unwarranted manner in internal union affairs, that it tended to formulate its policies in a manner consonant with Soviet foreign policy and supported positions not in the American national interest, that it was intolerant of other progressive groups, that it encouraged Negro separatism in practice, that it held insufficient regard for the individual, and that it was ineffective and given to endless internal discussion.

composed of persons dedicated in advance to finding him guilty, and that he had had several disputes concerning union policy with several of the persons who had filed the charges against him and who had proposed the members of the trial committee.

In explaining his motivation petitioner stated at the hearing before the committee of bar examiners: "My thinking then was that I was justified in [testifying falsely]. I do not think my thinking then was correct. In other words, I should have either refused to answer the question or told the truth, one or the other, but not testify falsely. . . . My thinking at that time was that—and it was incorrect—I had to do so in order to save my job, not be unemployed." He was supporting his wife, two of his children, and his mother-in-law and sister-in-law at the time.

Petitioner then told the bar examiners: "I want to make this clear. My view of personal morality in so far as truth in general is concerned has never varied too much. I throughout my life was a truthful, honest and forthright person in my dealings with people. I never lied in order to cause anybody harm or to secure unfair advantage of anybody. I never cheated anybody by lying at any time. In relationship to the employment picture the average working man thinks and so I thought that my job in relationship to work is to give the man eight hours work and honest labor for the pay I received, and I felt that what political beliefs I may have had in the past or may entertain currently had no place in the employment relationship, and so I viewed things in another context. I couldn't see in relationship to this whole sheet metal trial who would be harmed if I would continue to climb scaffolds and hang air-conditioning ducts and work in the industry to build ovens, regardless of what might have been in my head in the past or the present politically, and so I felt no compunction about it at that time. . . . I felt further that the Sheet Metal Workers Union, and nobody, had any business to deny me the right to give honest labor to somebody in return for wages because of something I may have thought misguidedly or honestly or otherwise."

Petitioner was found guilty by the trial committee and thereafter prepared an appeal containing substantially the same misrepresentations as those made before the trial committee. This document was mailed to union executives once in 1959 and twice in 1961. He testified that he felt it was a foregone conclusion that his appeal would be denied but

mailed it out as a formal, routine matter in order to keep the process alive so that he could continue to work as long as possible.

Petitioner testified that he had never advocated violence as a means of effecting social change since there were democratic means for achieving such goals in this country but that he could envision a situation in which resort to violence might be justifiable under a totalitarian regime. He stated that after he began to study law he grew to appreciate the position he had taken before the trial board and to realize that it was improper to have testified falsely, that he felt he had to abandon the type of thinking which led him to lie in order to retain his job, that he attempted to effect a change in his thinking, and that he believed he had succeeded. He stated he believed he would not be qualified to become a member of the bar if his state of mind was the same as it was at the times he testified falsely. Further, that insofar as an attorney's obligations were concerned he felt that no circumstances justified untruthfulness, that the responsibilities of an attorney are of a high fiduciary nature, and that a person who could not be relied upon to observe that standard should not be an attorney. Finally, he averred that he could take the oath required of an attorney without any reservations whatsoever.

An attorney who had known petitioner for 24 years and was aware of his false testimony wrote the committee: ''I have talked with Mr. March about his obligation to truthfulness as a lawyer serving as an officer of the court and the confidential adviser of the public. He realizes, and I am sure that this is genuine and sincere, that as a lawyer he may not misstate or misrepresent the facts in his dealings with the courts or fellow lawyers or clients. As I have talked with him I have gained the impression of real maturity achieved 'the hard way' to which his study of the law has contributed greatly. It also seems to me that he has achieved a real appreciation that the means of achieving social ends are of great importance in a society where the democratic process is held so dear. The travail of his experience, and the values of the law have given him new understanding of the implications of his conduct when he was not a lawyer.''[6]

Another attorney, also of long acquaintance, wrote, ''What impresses me most about March at the present time is that he is fully aware of the seriousness of what he did, that he

---

[6]Another portion of this letter is quoted in the earlier part of this opinion.

understands the difference between a worker's outlook in those circumstances and the professional requirements of a lawyer. He has satisfied me that he understands, and will live by this understanding, that the lawyer owes a duty of complete disclosure and scrupulous honesty in all of his professional dealings. I think that the serious self-examination which March has gone through as a result of his law school education and the proceedings before your Subcommittee have led him to a solemn and secure realization of his professional responsibilities for honesty, and that he has the strength of character and integrity to discharge those responsibilities without qualification.'' There are other letters of similar import.[7]

We next come to the evidence regarding petitioner's answers on the application forms. As we have seen, he answered in the negative question 13(g) on his law student registration form asking whether there was any incident of a derogatory nature, not called for by the prior questions, which would have some bearing on his character or fitness to practice law. Petitioner stated in answer to other questions on the form that he had been a member of the Young Communist League and the Communist Party, and specified the years of his membership. He stated also that he had been summoned before the Dies Committee in 1939 and that the committee was investigating purported subversive activities in the Chicago area, that he appeared before the Un-American Activities Committee in 1952, that the sheet metal workers' union had charged him with being a Communist at a hearing in 1959, and that he denied this charge. Finally, he noted that the records relating to his trial before the union could be obtained from a specified person at a stated address in Washington, D.C. Substantially similar answers were given by petitioner in

---

[7]Petitioner's employer stated: ''He genuinely regrets the false statements which he did make. . . . More important than his regret, however, is what appears to me to be a new point of view which has developed as a result of his study of the law. In the past, looking at his problems from the standpoint of a trade unionist and a worker, he was concerned almost exclusively with the ultimate effect of what he did. He was concerned with means only to the extent that such means might directly injure someone. . . . Nevertheless, in the study of the law, he has learned the importance of procedure and of the integrity of legal processes. The result is that his regret today is based not simply upon being sorry for having made mistakes in the past but upon a different point of view with respect to what is right and what is wrong. This point of view has developed naturally out of his conscientious study and real absorption of legal principles.''

his application for examination and admission to practice, with the exception that he omitted the statement that he had denied his Communist affiliations when referring to the charge brought by the union.

Petitioner testified that he understood question 13(g) as requiring him to answer whether there was any incident *not* mentioned elsewhere in his application which would reflect on his character and that he felt his reference to his appearance before the Dies Committee and the union trial committee, coupled with his admission of membership in the Communist Party, was sufficient to call his false answers to the attention of the bar examiners. He stated that he knew the transcripts of the 1939 and 1952 Un-American Activities hearings were available in the Los Angeles public library since he had consulted them in order to fill out the answers on one of the forms, and that he assumed the committee would read the material to which he referred. He denied he was attempting to conceal anything from the committee or to deceive it, and stated that he believed he had made a complete disclosure.

 It is our view that the committee was not justified in concluding petitioner's answers in the application forms indicate that he is not a person of good moral character. While it is true that he did not state unequivocally he had made false statements on the occasions in question, his answers on the application, when viewed as a whole, establish that he was not guilty of deliberate concealment.

In the application he not only revealed the dates of his membership in the Young Communist League and the Communist Party, but stated that he was called before the Dies Committee and the union trial committee, set forth the purpose of their inquiries, and even specified where the record of the union committee hearing could be obtained. On the law student registration form, after noting that he had been a member of the Young Communist League and the Communist Party, he stated he had denied his Communist affiliations before the union trial committee. Under all the circumstances, resolving all reasonable doubts in favor of petitioner, as we must, we cannot conclude that his failure to answer in the affirmative question 13(g) on the law student's registration form and its equivalent on the application for examination and admission and to specify that he had made false statements demonstrates that he has poor moral character.[8]

---

[8]*In re Gehring* (1943) 22 Cal.2d 708 [140 P.2d 413], cited by the committee, is distinguishable. There, an applicant for reinstatement failed

The committee implies that petitioner did not intend at the hearings to reveal that he had testified falsely in the past, basing its contention on the fact that his false testimony did not come to light until the second hearing and then only in response to the questions of the committee's examiner. Petitioner came to the hearing with a transcript of his testimony before the union trial committee. When the examiner questioned him about his false statements, petitioner produced a copy of the union trial committee transcript, and it was offered in evidence without objection. Petitioner explains that he intended to bring the facts relating to his false testimony before the bar examiners but that he was not given the opportunity to do so since the examiner opened the hearing and questioned him about the matter before petitioner was permitted to present his side of the case. There is no indication in the record that petitioner intended to conceal his false testimony from the committee.

We come, finally, to the basic question whether petitioner's false statements before the Dies Committee and in the union proceedings justify the conclusion that he is not a fit and proper person to practice law in that he has committed or is likely to continue to commit acts of moral turpitude. (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 453.) Petitioner urges that in the context in which he made his false statements his conduct was not sufficiently reprehensible to justify a conclusion that he should be barred from certification. We need not decide this question in the instant case because, even on the assumption that this conduct constituted moral turpitude, it appears from a careful reading of petitioner's testimony before the bar examiners that he has convincingly demonstrated his rehabilitation and that he is morally qualified to become a member of the bar. His statements appear to be remarkably candid. He answered searching questions regarding his past and present attitudes on a wide variety of political and social issues without equivocation. He not only admitted freely that his prior conduct was

to mention two occasions on which he had been arrested although the application for reinstatement called for ''a statement of any arrest.'' The applicant testified at the hearing before a local administrative committee that he had failed to mention the two arrests because the charges against him had been dismissed. It was held that he was either attempting to deliberately conceal material facts or did not possess the high quality of intellectual discernment and integrity necessary for an attorney and that, therefore, the recommendation against readmission should stand. In the present case petitioner specified in the application the information from which his falsehoods appeared.

unjustifiable but in several instances characterized it as more opprobrious than did the examiner for the committee. For example, when the examiner asked him on two occasions whether his answers before the Dies Committee were ''incorrect'' petitioner replied that they were ''false'' and ''untrue.''

We cannot ignore the extraordinary quality of the recommendations written on petitioner's behalf by an unusual number of attorneys. Although such evidence is not conclusive (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541 [248 P.2d 3]) it is entitled to great weight (*Hallinan* v. *Committee of Bar Examiners, supra*, 65 Cal.2d 447, 454) particularly where, as here, the writers have known petitioner for many years and several of them were aware of his misconduct and addressed their remarks specifically to petitioner's moral fitness in the light of those events. The record is bare of any evidence to contradict the sincerity of petitioner's assertion that his study of the law has brought a realization that there are more ethical means of achieving goals than those he had adopted in the past. His persuasive testimony regarding his views on the moral obligations of an attorney confirms this change in outlook. Rehabilitation, we have held, is a ''state of mind'' and the law looks with favor upon rewarding with the opportunity to serve, one who has achieved ''reformation and regeneration.'' (*In re Gaffney* (1946) 28 Cal.2d 761, 764 [171 P.2d 873]; *In re Andreani* (1939) 14 Cal.2d 736, 749 [97 P.2d 456].) In our view, petitioner has demonstrated convincingly that he has the moral character warranting certification to this court for the practice of law.

It is ordered that the Committee of Bar Examiners certify petitioner to this court as one qualified to be admitted to practice law.

BURKE, J.—I dissent for the reasons stated by the Committee of Bar Examiners, in refusing to certify petitioner to this court for admission to practice law in this state, which reasons are fully set forth in the majority opinion.

McComb, J., concurred.