In the Matter of The Application of A. T.
For Admission To The Bar of Maryland

[Misc. No. 12, September Term, 1979.]

*Per Curiam Order November 9, 1979.*

*Opinion Filed December 12, 1979.*

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed later, it is, this 9th day of November, 1979,

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the exception noted by the State Board of Law Examiners on October 16, 1979, in the above-entitled matter be, and it is hereby, removed, and it is further

ORDERED, that the applicant, A. T., upon taking the oath prescribed by the statute, be admitted to the practice of law in this State.

The cause was considered by MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

MURPHY, C. J., delivered the opinion of the Court. SMITH and DIGGES, JJ., dissent. SMITH, J., filed a dissenting opinion at page 516 *infra*, in which DIGGES, J., concurs.

Whether the applicant presently possesses the requisite moral character fitness that would justify his admission to the Bar of Maryland is the issue before us for determination.

Because of the applicant's criminal record, the Character Committee for the Third Judicial Circuit held a hearing on March 13, 1979, pursuant to Rule 4 of the Rules Governing Admission to the Bar of Maryland. The three members of the Committee who convened to consider the matter unanimously recommended to the State Board of Law Examiners that the applicant be admitted to practice. The Board conducted an additional evidentiary hearing on October 30, 1979, unanimously concluding that the applicant "amply demonstrated his complete and full rehabilitation and his present good character."

## I.

The applicant testified on his own behalf at both hearings and virtually the same evidence was presented before the Character Committee and the Board. As disclosed by the record, the applicant, born in May of 1941, had no academic or disciplinary problems throughout his first nine years of school. He was a good student and, in his first year of high school, he played on the school's soccer, basketball and baseball teams. During the summer of 1957, however, the applicant began drinking an addictive cough syrup, Cosanyl,

containing an opiate derivative. Eventually, he became addicted to this substance, drinking four to seven four-ounce bottles every day. The applicant explained that his high school associates introduced him to the drug, and he took it partly out of curiosity and partly out of boredom.

As a result of his addiction, the applicant lost interest in his academic work, and did not participate in athletics during his second year of high school. He became a disciplinary problem and in June and December of 1958 he was suspended for violation of various administrative rules. In February of 1959, he was expelled from school for being in an unauthorized wing of the school building. Allowed to return in September of 1959, he was suspended a month later for leaving school grounds without permission. By this time, the applicant's drug addiction was so acute that he was no longer capable of functioning as a student, so he officially withdrew from school.

The applicant used Cosanyl for about two years, but in 1959 the drug was placed on a prescription basis. At this time, the applicant began using illegal narcotics such as heroin, morphine and dilaudid. His drug addiction led to five drug-related criminal offenses. In February of 1959, when he was eighteen years old, the applicant was arrested for possession of barbiturates. He was given probation before judgment. In March of 1960, the applicant was charged with larceny. He and another drug addict had gone into a store and attempted to walk out with forty cartons of cigarettes. The charge was later dismissed. The applicant admitted that he would have sold the cigarettes to purchase heroin if his attempted theft had been successful.

In February of 1961, the applicant was arrested for two offenses — possession of a narcotic, dilaudid, and possession of narcotics paraphernalia. He received a five-year suspended sentence for this offense and was placed on unsupervised probation. In September of 1961, the applicant was again arrested for possession of narcotics paraphernalia, and for larceny of narcotics. While in a drug store, the applicant had gone behind the counter and had stolen narcotics from a drug cabinet. At the time he was apprehended by the police for the

larceny offense, the narcotics paraphernalia was discovered in his possession. As a second offender, the applicant was sentenced to a mandatory five-year term of imprisonment at the Maryland House of Correction. He also received a concurrent five-year sentence for the February, 1961 narcotic offenses, and a three-year concurrent sentence for the larceny of the narcotics. The applicant served forty-four months in prison.

While incarcerated, the applicant believed that he would not again resort to the use of drugs. During his incarceration, he received a High School Equivalence certificate. Upon his release in June of 1965, the applicant made some effort to abstain from drugs. He began to spend time with his old associates, however, and three or four months later, he resumed using heroin. The applicant continued regularly using heroin for about eleven months, until approximately August of 1966. At this time, he finally came to the realization that he needed help, and went to Dr. Emmett Davis.

Dr. Davis began treating the applicant with dolophine, a tablet form of methadone. Although the applicant did not immediately stop using heroin, his use gradually decreased. In September of 1966, the applicant was again charged with shoplifting cartons of cirgarettes. He received a three-month suspended sentence for this offense and was placed on probation for two years. Since this shoplifting offense, the applicant has not been charged with any criminal offense. As observed by the Board: "[t]he applicant stated that all shoplifting incidents occurred in connection with his use of drugs and were a part of his effort to obtain the money necessary to support his drug habit. There was no evidence of any separate shoplifting problem."

The applicant's shoplifting conviction in September of 1966 did not interfere with the progress he was making with the methadone treatment. By August of 1967 — within one year of taking methadone — the applicant stopped using heroin. He testified that he has not used illicit drugs since that time, a period which spans twelve years.

In August of 1967, Dr. Davis' personal efforts to treat drug addiction evolved into Man Alive Research, Inc., a

methadone maintenance program in Baltimore. During the applicant's treatment under this program, the staff's observation of his behavior and repeated urinalysis tests disclosed that he had abstained from illicit drugs.

According to the evidence before the Character Committee and the Board, the year of 1967 was a turning point in the applicant's life. He had stopped using illicit drugs, and a daughter was born of his first marriage. In July of 1968, shortly after the applicant found a program that would pay for his education, he enrolled in the Community College of Baltimore. At this time, he worked for the Baltimore City Water Department. In January of 1970, the applicant accepted part-time employment with Man Alive as an Administrative Assistant. He later worked for this organization as an Addiction Counselor, Financial Administrator, and as Acting Administrative Director. As an employee, the applicant was monitored more closely than nonemployee patients in treatment. He was required to leave two urine specimens per week under direct observation.

After receiving his A.A. degree from the Community College, the applicant became a student at the University of Maryland in Baltimore County (UMBC) in February of 1971. He received his undergraduate degree from UMBC in June of 1973. The year 1973 appears to have marked another milestone for the applicant. In April of that year, he transferred from the Man Alive program to Glenwood Life-Counseling Center to begin detoxification from methadone. The detoxification process, which lasted seven months, was successfully completed on October 29, 1973. The evidence thus shows that as of November of 1979, six years have passed since the applicant stopped using methadone. As pointed out by the Board, the applicant's medical records during his participation in the drug rehabilitation programs of Man Alive and Glenwood Life-Counseling Center reveal extensive and prolonged urinalysis demonstrating that he was "completely successful in achieving drug free status."

After the applicant graduated from UMBC in 1973, he attended graduate school at College Park to study philosophy. Divorced from his first wife, he sought and

obtained custody of his daughter. He thereafter submitted an application to law school and was accepted. While attending law school, he was employed as a bookkeeper for a Baltimore City law firm. At this time, the applicant terminated his extensive part-time employment with Man Alive, although he continued working for Man Alive every other weekend as an Addiction Counselor until early 1978. The applicant maintained his connections with this organization, as his second wife, whom he married in September of 1973, is head nurse at Man Alive. The applicant presently serves as Treasurer to Man Alive, and is a member of its Board of Directors.

In March of 1978, the applicant was granted a full executive pardon for his criminal convictions. Approximately ten months later, in January of 1979, he completed law school. He continued his employment as a bookkeeper for the law firm, and, in the summer of 1979, he assumed duties as a law clerk as well. The firm offered the applicant employment as an associate with the firm upon his admission to the Bar. The applicant was a successful candidate on the July, 1979 Bar examination.

At the hearing before the Board, inquiry was made respecting the motivation behind the applicant's unusual success in rehabilitating himself from drug addiction. The applicant indicated that he felt despair upon examining his life after his release from prison in June of 1965. He recognized his obsession with drugs, and said that all he could see in the future was prison and ultimately death. He was fearful of being arrested and imprisoned again, and experienced a great deal of guilt in spending money on drugs and thereby denying his wife and daughter various necessities. Out of a sense of desperation, he decided to change his life. He began to discover his capabilities. He derived great satisfaction from the successful completion of his undergraduate program, and did not want to jeopardize his educational accomplishments. The applicant told the Character Committee that he experienced and weathered law school and bar examinations and that it would be totally inconceivable for him to return to using drugs during any period of stress.

In recommending the applicant for admission to the Bar, the Character Committee stated that "[h]e appears to have adjusted to his return to society quite well and seems to be fully and totally rehabilitated from his prior activities, wherein he involved himself in the illicit use of drugs." The Committee further stated that "[i]t is our feeling that his early involvement in the use of illicit drugs is a thing of the past, and that he has learned from the experience and is now, and has been for many years, completely and fully rehabilitated."

With respect to his present moral character, the applicant received strong personal recommendations. A partner of the law firm at which he is employed testified at the Board hearing. He stated: "I think that the actions of the firm really speak louder than any words with regard to our confidence [in the applicant's] rehabilitation. He's been with us for approximately three years now, the first two of which he spent as our bookkeeper; and there was never any concern that we would end up short at the end of any month." The partner stated that the firm had offered the applicant an associate's position to practice law after his admission to the Bar, and that the firm has absolute confidence in the applicant's ability to practice law without returning to drugs.

The Character Committee had earlier heard the testimony of the managing partner of the law firm at which the applicant was employed. He explained that he had a personal commitment to the principle of rehabilitation. He told the Committee that he was the Chairman of the Board of Dismas House, a halfway-house program for persons who had been previously incarcerated. He explained his personal knowledge of the process of rehabilitation of persons who have been incarcerated. He expressed the utmost confidence and trust in the applicant and said "there's absolutely no question in my mind that he is rehabilitated."

## II.

Rule 2 d of the Rules Governing Admission to the Bar of Maryland provides that the applicant "shall at all times have the burden of proving his good moral character before the

Character Committee, the Board and the Court . . . ." We have said that no litmus test exists for determining whether an applicant for admission to the Bar possesses good moral character. *In re Application of David H.,* 283 Md. 632, 392 A.2d 83 (1978); *In re Application of Allan S.,* 282 Md. 683, 387 A.2d 271 (1978). In *Allan S.,* the Court set forth the controlling principles for determining whether an applicant with a criminal record has the requisite present moral character fitness to be admitted to the Bar. We said that where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good. *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957); *In re Monaghan,* 126 Vt. 53, 222 A.2d 665 (1966). We said that although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. *See Application of Davis,* 38 Ohio St. 2d 273, 313 N.E.2d 363 (1974); *Application of Alpert,* 269 Or. 508, 525 P.2d 1042 (1974). Thus, we observed that a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. *See In re Dreier,* 258 F.2d 68 (3rd Cir. 1958), and *In re Florida Board of Bar Examiners,* 183 So.2d 688 (Fla. 1966). We said that the ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. *See March v. Committee of Bar Examiners,* 67 Cal. 2d 718, 433 P.2d 191, 63 Cal. Rptr. 399 (1967). *Cf. In re Braverman,* 271 Md. 196, 316 A.2d 246 (1974), and *In re Meyerson,* 190 Md. 671, 59 A.2d 489 (1948). Finally, we noted the cardinal principle governing applications for original admission to the Bar is that the

absence of good moral character in the past is secondary to the existence of good moral character in the present. *Application of Davis, supra; In re Monaghan, supra. See also* Annot., 88 A.L.R.3d 192 (1978); Annot., 64 A.L.R.2d 301 (1959).

The Board's recommendation that the applicant possesses the requisite moral character is entitled to great weight. *Allan S., supra,* 282 Md. at 690-91. In considering its recommendation, however, the Court makes its own independent evaluation of the applicant's present moral character based "upon the records made by the Character Committee and the Board." Rule 4 c of the Rules Governing Admission to the Bar of Maryland.

Applying the principles articulated in *Allan S.* to the present case, we note, in considering the nature of the applicant's offenses, that all were directly related to his drug addiction. Furthermore, as pointed out by the Character Committee, the applicant was a user and not a dealer in drugs. In addition to the nature of the criminal offenses, we must consider the length of time that has elapsed since the criminal conduct occurred. In this case, the passage of time has been significant and substantial. The applicant's last offense occurred more than thirteen years before the Board hearing in October of 1979. Furthermore, the applicant has not used illicit drugs since August of 1967, a period of time spanning approximately twelve years. Finally, the applicant has been completely detoxified from methadone for more than six years.

As pointed out in *Allan S.,* the crucial matter upon which we must focus is the applicant's present moral character fitness, as evidenced by the convincing record of his rehabilitation. The record wholly supports the conclusions of the Character Committee and the Board that the applicant is fully rehabilitated from his prior illegal activity. In undertaking to prove his present good moral character the applicant not only presented convincing medical evidence of his rehabilitation from drug use, but also produced character witnesses who gave particularly strong endorsements of his present good moral character. He also introduced into the

record letters of recommendation from members of the legal and lay community. These letters attested to the applicant's present good character and are entitled to respectful consideration by the Court. *Allan S., supra,* 282 Md. at 692.

Giving due consideration to the nature of the applicant's offenses, the time of their commission, the circumstances involved, the fact that the burden rests upon the applicant to prove his good moral character, and most importantly, the convincing evidence of the applicant's rehabilitation, we think that he has established the requisite present moral character fitness that justifies his admission to the Bar of Maryland.

*It is so ordered.*

*Smith, J., dissenting:*

It is with regret that I once again dissent from the admission of an individual to practice before this Court. See *In re Application of Howard C.,* 286 Md. 244, 245, 407 A.2d 1124 (1979), and *In re Application of Allan S.,* 282 Md. 683, 693, 700, 387 A.2d 271 (1978).

Part of the problem apparently is a difference between my colleagues and me as to what constitutes good moral character. They seem to be of the belief that one can be said to possess good moral character if he has not violated the law lately. I do not see it that way. Thomas Paine, the political pamphleteer of the American Revolution, observed in *The American Crisis* No. XXIII (1783), "Character is much easier kept than recovered." I agree.

The Random House Dictionary of the English Language (unabridged ed. 1967) defines "character" in pertinent part:

> **1.** the aggregate of features and traits that form the apparent individual nature of some person or thing. **2.** one such feature or trait; characteristic. **3.** moral or ethical quality . . . . **4.** qualities of honesty, courage, or the like; integrity . . . . **5.** reputation . . . . **6.** good repute . . . . [*Id.* at 247.]

Webster's Third New International Dictionary (unabridged ed. 1961) states in pertinent part on this subject:

> **1:** ... **9:** reputation esp. when good .... **10:** a composite of good moral qualities typically of moral excellence and firmness blended with resolution, self-discipline, high ethics, force, and judgment .... [*Id.* at 376.]

The American Heritage Dictionary of the English Language (New College ed. 1976) defines the term in pertinent part:

> **1.** .... **3.** The combined moral or ethical structure of a person .... **4.** Moral or ethical strength; integrity; fortitude. **5.** Reputation: .... **10.** A description of a person's attributes, traits, or abilities.... [*Id.* at 226.]

In *World v. State,* 50 Md. 49 (1878), Judge Grason said for the Court:

> It was further contended that the evidence of the police officer was inadmissible, because it related to the *character* of the accused, instead of being confined to his *reputation.* Character and reputation are synonymous terms, and we can see no objection to the evidence introduced, that the character and reputation of the accused was that of a "common thief" during the time the witness knew him. [*Id.* at 56 (emphasis in original).]

Black's Law Dictionary (5th ed. 1979) states relative to character:

> The aggregate of the moral qualities which belong to and distinguish an individual person; the general result of the one's distinguishing attributes. That moral predisposition or habit, or aggregate of ethical qualities, which is believed to attach to a person, on the strength of the common opinion and report concerning him. A person's fixed disposition or tendency, as evidenced to others by his habits of life,

> through the manifestation of which his general reputation for the possession of a character, good or otherwise, is obtained. The estimate attached to an individual or thing in the community. The opinion generally entertained of a person derived from the common report of the people who are acquainted with him. Although "character" and "reputation" are often used synonymously, the terms are distinguishable. "Character" is what a man is, and "reputation" is what he is supposed to be in what people say he is. "Character" depends on attributes possessed, and "reputation" on attributes which others believe one to possess. The former signifies reality and the latter merely what is accepted to be reality at present. [*Id.* at 211.]

As to good character it says:

> Sum or totality of virtues of a person which generally forms the basis for one's reputation in the community, though his reputation is distinct from his character. [*Id.* at 623.]

If this young man has in fact reformed from his earlier drug habit and stealing, I am delighted. The fact that it is believed by some that he will not revert to his former habits, however, does not in my view automatically establish good moral character. Where would the majority draw the line? As judges and prior experienced practitioners of the law they know that many homicides are a once in a lifetime proposition in which there will be no recurrence of the circumstances giving rise to the homicide. Thus, in the absence of evidence of other violations of law, one could say that the person has reformed. Do my colleagues propose permitting convicted murderers to become Maryland lawyers since they have not killed anyone lately?

I think it safe to say that many of the lawyers whom we disbar for crimes involving moral turpitude would not once again engage in such conduct. Some of them have striven mightily over long periods of time to regain good standing in their communities. Yet the same judges who are passing on

this application but a few short months ago unanimously denied reinstatement to the bar of this Court of Messrs. Loker, Dippel, and Raimondi.[1] See *In re Loker,* 285 Md. 645, 403 A.2d 1269 (1979), and *In re Raimondi and Dippel,* 285 Md. 607, 403 A.2d 1234 (1979). See also *In re Barton,* 273 Md. 377, 329 A.2d 102 (1974). I point out that each of those individuals had numerous testimonials as to his present good character from persons of substance in their respective communities. I further point out that not one of those individuals served a prison sentence as long as the 44 months that the applicant here was incarcerated. I realize it can be said that the General Assembly in its wisdom mandated the length of that period in prison, but in so doing it expressed the public policy of this State. If the sole cause of the applicant's dishonesty was his drug habit, then I point out that when their applications for reinstatment were denied Messrs. Barton, Dippel, Loker, and Raimondi each had been on the proverbial straight and narrow path for a longer time than the applicant here. He can count only the period since October 1973.

It should be noted that if the applicant here were to be called as a witness in a court proceeding, his prior convictions could, and undoubtedly would, be used to attack his credibility. Maryland Code (1974) § 10-905 (a) Courts and Judicial Proceedings Article; *State v. Huston,* 281 Md. 455, 459-61, 379 A.2d 1027 (1977), and *Cousins v. State,* 230 Md. 2, 4-5, 185 A.2d 488 (1962). In the unusual situation in which a lawyer has been called to the witness stand in the areas of the State where I have practiced law it has been the practice often to waive placing him under oath because of the very high standard to which all members of the Bar are expected to adhere.

Our requirement that a candidate show himself to be possessed of good moral character is for the purpose of protecting the public. In the same manner we have said that the imposition of a sanction on an erring attorney is not for purposes of punishment of the individual lawyer but for the protection of the public. *Attorney Griev. Comm'n v. Levitt,* 286 Md. 231, 406 A.2d 1296 (1979); *Attorney Griev. Comm'n*

---

1. Judge Digges did not sit in *Loker.*

*v. Lockhart,* 285 Md. 586, 596, 597, 403 A.2d 1241 (1979); *Attorney Griev. Comm'n v. Andresen,* 281 Md. 152, 160, ·379 A.2d 159 (1977), and cases there cited. The practice of law often involves handling the funds of clients running into tens of thousands and even hundreds of thousands of dollars. This can and does present a temptation to some individuals, as experience has amply demonstrated. Therefore, I regard honesty as one of the most important traits of character which should be required of a prospective lawyer. He should be forthright and honest in all of his dealings, but particularly where the funds and property of others are concerned. When a person is admitted to the Bar he becomes an officer of this Court. When we admit him we are in effect certifying to the general public that he is a person to whom the affairs of others may safely be entrusted. I am not prepared at this time to say that this young man is possessed of good moral character and thus is a proper person to be an officer of this Court.

I am authorized to state that Judge Digges concurs in the views here expressed.