## IN THE MATTER OF THE APPLICATION OF HOWARD C. FOR ADMISSION TO THE BAR OF MARYLAND

[Misc. No. 11, September Term, 1979.]

*Decided November 2, 1979.*

Before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

Order of Court filed. SMITH, DIGGES and ORTH, JJ., dissent and SMITH, J., filed a dissenting opinion at page 245 *infra,* in which DIGGES and ORTH, JJ., concur.

## O R D E R

The two petty theft offenses, for which the applicant was placed on probation without verdict, having been legally expunged under the provisions of Maryland Code (1957, 1976

Repl. Vol., 1979 Cum. Supp.), Article 27, § 737, and the State Board of Law Examiners having declined to consider such offenses in determining the moral character of the applicant for admission to the Bar; and it also appearing that the Board found, in the alternative, that if such offenses were properly to be considered in evaluating the applicant's character, he had in fact sufficiently rehabilitated himself since the commission of the two offenses to justify his admission to the Bar, it is, this 2nd day of November, 1979,

ORDERED, by the Court of Appeals of Maryland, upon review and consideration of the proceedings before the Character Committee for the Seventh Judicial Circuit and the State Board of Law Examiners, that the exceptions heretofore filed against the applicant be, and they are hereby removed, Judges Smith, Digges and Orth dissenting for reasons to be expressed in a dissenting opinion to be filed with this Order, and it is further

ORDERED, that the applicant, Howard C., upon taking the oath prescribed by the statute, be admitted to the practice of law in this State.

*Smith, J., dissenting:*

At a time when many people are lamenting the apparent breakdown in moral standards in this nation and condemning the permissiveness of our society, I feel impelled to raise my voice in protest against the admission of yet another confessed thief to the Bar of this Court. See *In re Application of Allan S.,* 282 Md. 683, 387 A.2d 271 (1978), for another instance in which a petty thief was permitted to become a Maryland lawyer.

Because the order in this matter reflects none of the facts, I shall set forth such as are necessary to a clear understanding of the matter before the Court.

I

The applicant was born July 11, 1949. When he filed his application for registration as a candidate for admission to the Maryland Bar he was asked by question 11 to submit a record

of any criminal proceedings which might have involved him. He was admonished, however, not to "report any arrest or court proceedings, the record of which [had been] expunged pursuant to law." Question 17 requested him to list "any unfavorable incidents in [his] life, whether at school, college, law school, business or otherwise, which m[ight] have a bearing upon [his] character or [his] fitness to practice law, not called for by the questions contained in th[at] questionnaire or disclosed in [his] answers." He referred to an attached letter in answer to both of those questions. In it he proceeded to make known to the Board of Law Examiners the fact that he had been twice involved in shoplifting incidents, the records of which, he said, had been expunged.

The facts were all brought out at hearings before the Character Committee of the Seventh Judicial Circuit and at three hearings before the Board of Law Examiners.

The applicant served as president of student government at the University of Maryland, as president of the Inter-residents Hall Association which he said administered all dormitories on the University's College Park campus, and prior to that as president of the Hill Area Council. He stated the latter group represented one-half of the dormitories on the University campus located geographically on the part of the campus known as "the Hill." Later he was designated as chief justice of the Honor Court of the University of Baltimore Law School. In the latter position it was his responsibility, as he put it, "to preside over hearings involving the reported incidents of violations of the Student Honor Code." Moreover, he had attended Randolph Macon Academy. In response to a question as to the honor code there, he said it was, "Thou shalt not lie, steal or cheat."

On April 24, 1974, when he was 24 years of age, the applicant was involved in a shoplifting incident where he entered a supermarket near the University. As he put it, he "was arrested or . . . detained by the store manager for taking chicken and cheese." Inquiry was made of him as to whether he had any money. He responded to that question and a direction to describe this first incident:

A Yes, and I did basically go in to pick up

something. I went in to get something. I forget what. And when I got in there I just had picked up the chicken and the cheese.

Q Where did you place it that time?

A Down my pants.

Q And when you say "down your pants," how did you —

A Down the front of my pants.

Q Down the front of your pants?

A Yes.

The applicant received probation before judgment at the trial on that charge. He said he was "very upset" by the occurrence. The record was expunged on June 20, 1977, a short time prior to his filing on July 5, 1977, of his application for registration as a candidate for admission to the Bar. The application was actually dated June 1, 1977.

The applicant formerly resided in Cumberland. He entered law school in August 1974. The following summer he journeyed to Cumberland for the purpose of borrowing money from a Cumberland bank. This set in motion the incident of June 18, 1975. He said because of the lateness of the hour he did not plan to return to Baltimore that day. The applicant met a friend who offered to let him stay at his home across the line in Pennsylvania. He accompanied the friend into a store. The friend apparently intended to buy some soda. The applicant was questioned by the Character Committee as to what took place involving his conduct:

Q You didn't have any money with you when you went into the store?

A I had some money. I didn't — I certainly didn't have enough to pay for the steaks.

Q So did you and Steve discuss it before you went in?

A No. Steve was not a part of that.

Q All right. So you went into the store, and if you can picture yourself in the store at that time, did you walk directly to the meat counter?

A No. I think Steve went to get some sodas and then I went to the meat counter and he followed me. I said, "I am going to pick up some steaks," and I put them down my pants.

Q All right. And then what did you do?

A Well, we proceeded to go towards the front of the store and we were stopped.

In describing the Cumberland incident before the Board the applicant testified:

On the way to the farm he said let's stop in and get some beer at the store, and when we were in the store, I took some steaks and put them down my pants. Steve did not know that I was going to do that. I mean, he saw me do it and he said, "What are you doing?" and I told him what I was doing, and he said, "You are crazy," or something to that effect. As we went to leave the store, we were both stopped, we were both arrested, we were taken by the Police to a Magistrate. We were booked and we stood trial, and both of us were given probation before verdict.

The applicant attributes his stealing to immaturity. A board member questioned him and he responded:

Q Mr. C. ... as President of the Student Government, that was a position of great responsibility I would take it; was it not?

A I would say; yes.

Q I would think so. And would you characterize that as a position that required a great deal of maturity in dealing with the Student Body, the Student Government, the University Government, dealing with a budget?

A Yes; I would say so, sir.

Q I would think so. And you discharged that responsibility with maturity?

A I believe so, sir. There are people at the University that would challenge that.

The applicant says that he has matured since these incidents, a part of which maturing process he attributes to the influence of his wife whom he met but a short time prior to the second incident. When that second incident took place he had already completed his course in criminal law at the University of Baltimore Law School. He claims to have done no stealing since the Cumberland episode.

Originally we were provided with an exhibit in the form of a letter to the applicant from his attorney dated September 3, 1976, but we were not provided with a copy of an expungement order relative to the second incident. The letter advised the applicant that the attorney "ha[d] filed and processed in the District Court for Allegany County a Petition for Expungement." It further stated, "In checking with the Court we find that the Petition has been granted and the record involving your violation has been properly expunged." At one of the hearings before the Board, however, the applicant said that he had "never received an order of expungement, so [he was] not positive." Before the Character Committee he adverted several times to his belief that under a local statute applicable to Allegany County a record "is expunged automatically within 90 days." We were unable to locate such a statute.

We noted that Chapter 260 of the Acts of 1975 enacted Maryland Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 737 relative to expungement of police and court records. We further noted that § 737 (c) provided that the time for filing a petition for expungement was "not . . . earlier than three years nor later than eight years after the date the judgment or order was entered or the action was taken which terminated the proceeding," with exceptions not applicable to this matter, and thus that the record should not have been expunged when it appeared to have been.

As a result of examination of the file in this case it became apparent to the Court that there had been other incidents of thievery in which the applicant had been involved, as was brought out at the hearing before the character committee.

The record reflects questioning by Ronald A. Willoner, Esq., a member of the Committee, and the answers of the applicant:

Q I am going to ask you this other question. I don't know whether it is even a fair question, but I am going to ask it to you. Have you — after the age of 17, did you ever shoplift anything else other than at these two times?

A You asked me that when we met the last time, and then said "No, I don't want to hear the answer." I stated somewhat to the effect that — you know, when I think about it, I think I have. I couldn't give you the number, but it was not a habit. It wasn't something that I did regularly. I can't say I never did it, and yet I can't say, you know, "I did it ten times or five times." I am sure I did. I know it would never have been anything but food.

I never took — you know, I was never so indiscriminate that I was taking — that I was just regularly going out and taking like something from a sporting goods store and something from a clothing store. But — no, I can't say I never have not taken anything since I was 17, but I can say that it was not a regular — something I did regularly.

Since we had before us an implication of other stealing incidents and the fact that the expungement order might have been defective, we passed an order on July 5, 1979, remanding the matter "to the State Board of Law Examiners for further investigation by it or the Character Committee, or both, into both of such matters."

On the remand the Board was provided with an expungement order concerning the Allegany County incident passed on July 31, 1979, pursuant to a petition to reopen the case and to direct "a second expungement."

The Board in its report to us after the remand summarized the applicant's version of some of the other stealing incidents in which he had been involved:

First of all he described a raid that he and other members of the Allegany High School football team

made on a food table set out by the alumni of Bruce High School in Westernport, Maryland, for its team, alumni and fans. He described a series of incidents which occurred while in his senior year in high school at McIntyres Food Store in Cumberland which sold Cokes, cookies and soft drink on the honor system, and other small items. Applicant testified that it was the practice, in which he participated, to "bolt the bill." He testified that his participation was not often, and that he recalled getting Cokes and cupcakes without paying for all the items he received. He recalled taking cheese from the same Seven-Eleven store in which he was subsequently caught, during the same week in which he was caught [, referring to the 1974 incident]. He recalled being accused of, but having no hand in taking 2 roasts from the faculty lounge at the University of Maryland. Applicant further testified that the only items he had ever wrongfully taken were items of food.

Applicant characterized the Bruce High School incident as a prank, but the McIntyre incidents as stealing. He also testified that there had been no incidents of stealing since his second arrest.

As earlier indicated, the applicant was born on July 11, 1949. He was graduated from Allegany High School in Cumberland in 1967. Thus, he would have been 17 years of age when he entered his senior year in high school.

## II

I first deal with the effect of the expungement orders. Code (1957, 1976 Repl. Vol.), Art. 27, § 739 (a) makes it "unlawful for any person having or acquiring access to an expunged record to open or review it or to disclose to another person any information from it without an order from the court which ordered the record expunged . . . ." It does not say that we may not take cognizance of the *conduct* there involved in determining whether an applicant for admission to the Bar of this Court is possessed of good moral character. I point out

that it is not the *record* of the applicant's court involvement which I here consider, but his *conduct* as disclosed by him. Thus, the situation is but little different from that before the Court in *Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 535-36, 325 A.2d 718 (1974), where we rejected a lawyer's contention that since the record showed he was found not guilty under a criminal indictment he could not be disciplined by us upon the basis of those same facts. When we determine that an individual is or is not possessed of such moral character as will justify his admission to practice as a lawyer in Maryland we are exercising a judicial function. Although, as recognized in *Bastian v. Watkins, Clerk,* 230 Md. 325, 329, 187 A.2d 304 (1963), the General Assembly in the exercise of its legislative functions may prescribe residence, education, and the like as a prerequisite to admission, the determination of what in any given case constitutes good moral character is a matter for this Court.

It is stated in 1 E. Thornton, *Attorneys at Law* § 28 (1914):

> It is undoubtedly true that the power to admit one to practice as an attorney at law is a judicial function. It is a power inherent in the court, which is to be exercised by a sound judicial discretion. . . . Early in the national jurisprudence it was held that the power to admit and remove was the exclusive province of a federal court. And this ruling has been consistently maintained. Where a state constitution lodges the judicial power exclusively in the courts, as a co-ordinate department of government, the legislature will not be permitted to encroach upon the judicial powers by assuming to make admission to the bar a legislative function. [*Id.* at 31-32.]

This separation of powers is found in Maryland since our Declaration of Rights, Art. 8 provides, "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." In *Rosenthal v. State Bar Examining Committee,* 116 Conn. 409, 415, 165

A. 211 (1933), the court said, "Proceedings for the admission of attorneys are not actions or suits at law; they are in the nature of investigations by the courts or their representatives to determine whether particular candidates are qualified to become its officers." Mr. Justice Field said for the Court in *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 379, 18 L.Ed. 366, 370 (1867), "[The] admission or [the] exclusion [of persons as attorneys] is not the exercise of a mere ministerial power. It is the exercise of judicial power . . . ." He then went on to quote from *Ex parte Secombe*, 60 U.S. (19 How.) 9, 15 L.Ed. 565 (1857), where Chief Justice Taney said for the Court, "[I]t has been well settled, by the rules and practice of common law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counselor . . . ." Support for the view that in determining good moral character we exercise a judicial function is found in 7 C.J.S. *Attorney and Client* § 6 (a) (1937), in most of the host of cases cited in n. 61 to that section both in the original volume and in the 1979 supplement, and in *Brooks v. Laws*, 208 F.2d 18, 29 (D. C. Cir. 1953).

In evaluating whether the applicant here is possessed of good moral character we certainly are entitled to consider conduct which he has admitted. In my view, however, since such an evaluation is a judicial function the expungement of the criminal record is of no significance and the General Assembly is without power to specify otherwise as to a potential member of the Bar.

### III

That the applicant is not a weakling easily lured from the proverbial straight and narrow path by his acquaintances is demonstrated by the variety of responsible positions in which he has served. Indeed, in neither of these two incidents was there even an implication that influence of other people was responsible for his extensive criminal activity.

It is obvious in this case that the applicant sought to fit himself within *In Re Application of Allan S.,* 282 Md. 683, 387 A.2d 271 (1978), rather than *In Re Application of David H.,*

283 Md. 632, 392 A.2d 83 (1978). In *David H.,* the Court referred to the fact that in *Allan S.*

> the criminal acts had occurred approximately 11 and 7 years respectively prior to the Board's decision on the applicant's request for admission, and the rehabilitative evidence presented at the hearing was particularly cogent and strong. In addition to letters from a number of members of the legal and lay community expressing unqualified trust in the applicant's present moral character, a former employer holding a high government position testified in his behalf at the Board hearing. [*Id.* 283 Md. at 639-40.]

The majority was of the view that this justified the admission of Allan S. In this case, also, we have been provided with testimony and letters similar to that found in *Allan S.* However, the fact pattern in this case is virtually the same as that so cogently described by Chief Judge Murphy for the Court in *David H.:*

> Unlike the circumstances in *Allan S.,* the present applicant's criminal conduct, by his own admission, persisted over an extended period of time. The thefts committed by the applicant were not, as in *Allan S.,* isolated criminal transgressions; rather, they constituted a continuous course of criminal activity which the applicant did not see fit to terminate until after his graduation from college. [*Id.* at 640.]

There are two significant differences between this case and that of *Allan S.* and no significant difference between this case and that of *David H.* The first difference is that here the last criminal activity took place after the applicant had completed his first year in law school. The second is that a much longer period of time had passed in *Allan S.* between the occurrence of the last criminal act and the time when his application for admission to the Bar was considered. It will be noted from what we have heretofore quoted from *David H.* that in the case of *Allan S.* seven years had passed between

the last incident and the Board's decision on his request for admission. Here the elapsed time is less than four years.

The majority would do well to bear in mind the comment of Judge Markell for this Court in the case of *In re Meyerson,* 190 Md. 671, 678, 59 A.2d 489 (1948), quoted many times since then, to the effect that "due regard for the administration of justice does not permit disbarment and reinstatement to be made mere adjuncts to reform schools and the parole system." By the same token the original admission of attorneys should not be made such an adjunct. We have just observed in the case of *In re Raimondi and Dippel,* 285 Md. 607, 617, 403 A.2d 1234 (1979), quoting from *In re Cannon,* 206 Wis. 374, 383, 240 N.W. 441 (1932), "The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attaché of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute."

Stealing has been forbidden since the beginning of recorded legal history. The applicant says he was "very upset" the first time he was caught stealing. It is apparent, however, that the trauma of this experience was not sufficient to dissuade him from further peculation and to convince him of the wisdom of adhering to the established, accepted mores of our society, for, less than 15 months later after he had just completed a course in criminal law, he proceeded once again to steal food, and to stick it again in his pants. There is not the slightest indication that the applicant here was on the verge of starvation or was in any way short of food at the time of any of his food thefts. Thus, I see no significance whatever in his statement that he never stole anything but food. One would think that if he had learned anything in his course in criminal law, particularly after having been placed on probation for shoplifting just a short time before entering law school, it would have been that it is against the law to steal. One would think that the combination of this course and his prior apprehension would have indelibly impressed this truth upon his mind. Since such an impression was not made, I see

no reason 'for believing that this applicant has now been convinced that he must not steal.

Considering the fact that the applicant has stolen so many times that even he does not know the exact number, that apprehension for shoplifting and a resultant probation before judgment did not dissuade him from further stealing less than 15 months later, and that the last incident of thievery took place after the applicant completed his law school course in criminal law, I am unwilling to place my stamp of approval on him so that he may become an officer of this Court. For all of the reasons so well expressed by Judge Digges in his dissent in *In Re Application of Allan S.,* 282 Md. 683, 693, 387 A.2d 271, 277 (1978), and his concurring opinion in *In Re Application of David H.,* 283 Md. 632, 641, 392 A.2d 83, 88 (1978), I would deny the applicant's admission to the Bar.

I am authorized to state that Judge Digges and Judge Orth concur in the views here expressed.