IN RE APPLICATION OF G. L. S. FOR ADMISSION
TO THE BAR OF MARYLAND

[Misc. No. 8, September Term, 1981.]

*Decided January 7, 1982.*

The cause was argued before MURPHY, C. J., and SMITH,
DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Edward Smith, Jr.,* for applicant.

DAVIDSON, J., delivered the opinion of the Court. SMITH,
DIGGES and RODOWSKY, JJ., dissent. DIGGES, J., filed a
dissenting opinion at page 398 *infra,* in which SMITH and
RODOWSKY, JJ., join.

G.L.S. (applicant) has applied for admission to the Bar of
Maryland. In 1968, in the United States District Court for
the District of Maryland, the applicant pleaded guilty to the
charge of armed robbery. Because we find convincing evi-
dence of the applicant's full and complete rehabilitation and
of his present good moral character, we shall order his
admission.

The applicant was born in Baltimore City of teenage
parents on 13 October 1947. At a very early age, he was
placed in homes of relatives and subsequently in foster care

homes. In 1964, at the age of 17, the applicant, then living in a foster care home, dropped out of the tenth grade and enlisted in the army, where he completed his high school education. On 22 September 1966, the applicant was honorably discharged with a rank of private. He was employed from October, 1966 until June, 1967 when he was laid off due to lack of work.

On the evening of 8 October 1967, the applicant, while at a bar, met, for the first time, two men who planned to commit a bank robbery. The following day, these two men, each of whom was armed, entered the Lovettsville Branch of Farmers and Merchants National Bank of Hamilton in Lovettsville, Virginia, and took approximately $7,000 from the tellers' cages. The applicant, who was unarmed, was the driver of the get-away car.

The applicant pleaded guilty to the charge of armed robbery and was sentenced to a 10-year term. He was incarcerated in a federal penitentiary for a period of six years. While incarcerated, the applicant was classified as a "managment problem" and was repeatedly transferred from one federal penal institution to another. In prison, the applicant became an avid reader and participated in extension courses offered by the University of Georgia. On 17 May 1974, he was released and placed on parole.

Upon his release in 1974, the applicant returned to Baltimore and enrolled in Morgan State University. On 17 May 1975, he was married. While attending Morgan State, he was supported by his veteran's benefits, his own earnings, and his wife's earnings. After only three years, in May, 1977, he received a degree in political science. He attained a 3.4 average and was graduated "with Honor." His parole was successfully terminated approximately 13 months before his sentence expired.

In 1977, the applicant applied for admission to the University of Maryland School of Law. In response to a question on the application for admission requesting an account of activities or occupations for any time intervals between high school and entrance into college, the applicant listed "U.S.

Federal Prison" for the period from 1967 to 1974. In response to a question whether he had ever been convicted of any crime other than a traffic violation, the applicant responded "yes." Subsequently, he was asked to explain the circumstances of his criminal activity. In a letter to the law school dated 4 March 1977, he responded:

"Thank you for this opportunity to explain my imprisonment. I anticipated that it would have serious consequences for my application to law school.

"As you may well imagine, prison is a powerful influence in my life. Whatever enthusiasm — and I am enthused — I have developed for living I have done so as a result of that experience.

"But perhaps you are more interested in how I came to be a prisoner, so I would like to begin there. At 19, unmotivated and unconcerned, I robbed a bank in Loudon County, Virginia — an act of selfishness and alienation. I played a minor role — if anything can be minor about bank robbery. I drove the car used in the 'get-a-way.' I prefer not to analyze my motives, at least no farther than easy gain. My motives were confused, even then. But more importantly any explanation of motive would be more an excuse than a reason. At my trial I did not deny my guilt, nor do I deny it now; nor do I dismiss criminal action as a natural channel of the poor and oppressed, as was fashionable in the sixties and seventies. I prefer instead to call a spade a spade; and work on my life in a way that may perhaps mitigate what has been.

"Once prison had forced change upon my life, each new event came automatic. Because I had the time and the need to understand, I began to read. Influenced by the times, I became what is now referred to as political, that is, I began to act and react in a pattern that challenged authority: I opposed myself to prison, and for that opposition, I spent six and one-half years in prison. I was sent to prison

because I robbed a bank, I was kept because I could not conform, or would not. But I read, and as I read living grew in importance. It became an end in itself: not the quantity of life, but its quality. The more I learned of living the more I wanted to live the more I wanted that life to be full and involved. "I decided on college in prison, and began that resolve with extension courses from the University of Georgia. It was almost inevitable that I would return to Baltimore, attend Morgan State University and study Political Science. And it was as inevitable that once involved in the Political Science Department that I would turn to law.

"As an attestment I have attempted to educate myself. The task is far from complete, I know. But in less than three years I have completed 128 credits of undergraduate work, with an estimated average of 3.4. I request admission into the University of Maryland with the conviction to work harder. The past cannot be mitigated, but a man's life can. If given the opportunity to study, I will do so gladly and with aggression and enthusiasm. Gentlemen, I can achieve. I ask only for the chance."

Thereafter, the applicant was admitted to the University of Maryland School of Law. While there, he was employed by the Legal Aid Bureau, the Prisoners' Assistance Project, and the Office of the Attorney General. He was graduated in May, 1980 and in November, 1980 was employed by Foster, Matthews and Hill, P.A. as a law clerk.

On an application signed 20 May 1980, he applied for admission to the Bar of Maryland. Two questions on the character questionnaire are significant here.

Question 5 of the character questionnaire stated:

"The following constitutes every residence, address and place (with zip code) where I have lived within the last 10 years.

|  |  | FROM | TO |
|---|---|---|---|
| City and | Street and | Month and | Month and |
| State | Number | Year | Year" |

In response, the applicant listed his residences between the years 1974 and 1980. He did not list any "residence, address and place" where he had lived for the years 1970 to 1974, during which period he was incarcerated.

Question 11 of the character questionnaire stated:

"The following is a complete record of all criminal proceedings (including traffic violations other than an occasional parking violation) to which I am or have ever been a party: (If 'None' so state)

|  |  | Nature of |  |
|---|---|---|---|
| Date | Court | Proceedings | Disposition" |

In response, under the heading "Date" the applicant placed "11/67" and under the heading "Court" the applicant placed "U.S. District Ct. for the District of Maryland." Under the headings "Nature of Proceedings" and "Disposition" the applicant provided no information.

On 26 August 1980, a member of the Character Committee for the Eighth Judicial Circuit (Committee) interviewed the applicant. On 10 October 1980, she made a recommendation and report to the Committee in which she stated:

"I have reviewed responses to inquiries in regard to [G.L.S.] and Mr. [S.'s] Application for admission to the Bar. I have also had a personal interview with Mr. [S.]. I cannot recommend Mr. [S.] for admission because he failed to give complete answers to questions 5 and 11 on the Application. In my personal interview with Mr. [S.], he stated that he had been convicted of a felony in the U.S. District Court, District of Maryland and sentenced to ten years in prison. In my view this Application must be reviewed by the Committee."

On 26 March 1981, the Committee held a hearing to inquire into the criminal charge of which the applicant was convicted in 1968; to determine whether the applicant had adequately disclosed his conviction on his application; and to determine whether the applicant had been rehabilitated. After hearing testimony from the applicant and a number of character witnesses, and considering numerous letters of recommendation from friends, employers and teachers, including the Dean of the University of Maryland School of Law, the Committee found that the answers to Questions 5 and 11 were adequate because they furnished sufficient information to alert the Committee to the need for further investigation and inquiry. In addition, they found that the applicant was rehabilitated and possessed good moral character. Accordingly, the Committee unanimously recommended to the State Board of Law Examiners (Board) that the applicant be admitted to the Bar of Maryland.

On 5 June 1981, the Board held a hearing. The applicant was repeatedly asked to explain his responses to Questions 5 and 11. With respect to Question 5, requiring a list of every residence, address and place where the applicant lived within the last 10 years, the applicant indicated that his failure to provide any information for the years from 1970 to 1974 occurred because he did not consider the federal penitentiary a residence or a place where he lived. Illustrative of his explanation is the following:

> "When I was asked to list my residences for ten years I stopped at 1974 because I had no reason to believe that the U. S. Federal Penitentiary was a residence of mine. I never considered it a residence. I never considered it a place where I lived. I always considered it a place that I was confined and for that reason I felt no reason to mention the fact that my residence was the Atlanta Federal Penitentiary."

With respect to Question 11 requiring a complete record of all criminal proceedings to which the applicant had been a party, he indicated that his failure to specify the nature and disposition of the criminal proceeding in which he was

involved occurred because he was in a hurry to complete the application by the filing deadline and not because he intended to conceal his conviction. Illustrative of his explanation is the following:

> "At the time I was filling out the application I was pressed for time. There was a deadline in submitting that application. The fact that I did not mention the bank robbery, per se, did not say that the crime was bank robbery merely was an oversight, something that I did not intend to do. I had actually intended to fully disclose to the Committee the nature of the crime itself."

At the hearing, the applicant further indicated that at the time he filed the application he believed that he had completely disclosed all of the necessary information. He pointed out that when, at an interview with a member of the Committee, his alleged failure to fully disclose was called to his attention, he conceded that his responses to Questions 5 and 11 were not complete, and then voluntarily provided all of the requisite information. Illustrative of his explanation is the following:

> "Initially when Ms. Mason brought it to my attention that I had not completely detailed all of the information they wanted in question number 5, I kind of reacted towards, well, a bit aggressive. I knew that this was important to the Committee and to the Bar Examiners. I had believed that I had completely disclosed all of the information. So when she brought it to my attention my attitude somewhat changed. She showed me the application and I saw then that I had not submitted completely all of the information that was needed and I told her the rest of the information."

Moreover, the applicant emphasized that he did not intend to conceal necessary information in the hope that his application would "slide by." Illustrative is the following colloquy:

"Q ... Did you have any intent whatsoever, either consciously or unconsciously, now that you have had time to reflect on it, to fail to disclose to the Court of Appeals and its agents or its employees that you had been convicted of a Federal crime and that you had served time away from the State of Maryland with respect to that crime?

"A I certainly can't answer that question in terms of unconsciously, but consciously I never intended to omit anything. I intended to disclose everything fully and I saw it as my duty to disclose everything fully.

. . .

"Q. Are you telling this Board that it never entered your mind in answering either question 5 or question 11 that perhaps not actually answering those may allow the petition to slide by?

"A I don't see how the petition could have slid by.

[Question] [e]leven asked about crimes and I mentioned that I was convicted of a crime in 1967 in the U. S. District Court. I don't think that given that that the application could have possibly slid by."

In addition, the applicant was repeatedly questioned concerning his rehabilitation and his present moral character. The applicant admitted that he was responsible for his criminal act which was morally wrong and indefensible. Illustrative is the following colloquy:

"Q ... Did you, after your release from prison, blame your incarceration and prison on anyone else other than yourself?

"A Well, I didn't. It was impossible to do that. I robbed the bank; nobody forced me to do it. There was nobody to blame but myself.

. . .

"Q Mr. [S.], do you at the present time conceive any difference in degree of culpability between

yourself and the two persons that were involved in the crime?

"A No. In fact, the crime could not have come off if I hadn't participated. So, no, I don't. I see my participation as equal to the others."

The applicant also testified as to his attitudinal changes with respect to a societal need for order. Illustrative is the following colloquy:

"Q Would you please tell the members of the Board about your attitude with respect to the legal system, and you have had some time to reflect on it, I would assume, in light of your own experiences as an inmate in a penal institution. Could you tell them exactly how you feel about the legal system at this point?

"A The legal system is a large entity, just to summarize it, but it's obvious that there is need in any society for stability. The stability that is chosen by the members of that society generally corresponds at that particular time to what is most efficient for the management of the affairs of that society. There is need for order and need for social tranquility and I respect that need.

"Q When you committed this crime did you have the same opinion that you have now?

"A I had no respect at all for the law for some time. I had hardly no respect for the people that maintained the law. I thought that the crux of the matter was force and without force that there would be no law, there would be no need for it.

"Q You were, of course, much younger at the time; is that correct?

"A I was 19 at the time.

"Q When did you first start to notice, and I would assume that these are value systems that you're talking about right now; is that correct? The value systems that you have developed since that time?

A Yes.

"Q When did you first develop these thoughts about order rather than disorder and force?

"A I think it was almost immediately. When one finds themself in prison, prison is not the most glamorous place to be. One realizes that he has offended not only society and other people but himself. It forces a view of yourself that is negative. It is against all of the values that you have developed over time. I felt as though everything that I had developed to that point, my attitude, my way of looking at the world was totally incorrect. It had to be incorrect because if it was correct I would not have wound up in prison. In order for me to do something not to continue, to avoid having to continuously recidivate into prison I would have to change my attitude."

The applicant further testified as to his attitudinal changes with respect to his personal values and goals. Illustrative is the following colloquy:

"Q With respect to your conviction, and we do have a record that was compiled by the Eighth Judicial Circuit Character Committee, would you please tell the members of the Board of Law Examiners since you were incarcerated the changes that have occurred in your life up to this point?

"A When you say the changes, do you mean the kinds of things that I have done?

"Q The kinds of things that you have done since your incarceration.

"A Well, immediately, of course, when I went to prison I did very little. I had a reaction to it, I would imagine. I was bitter. I was angry. I did not want to be there. So what I did for maybe throughout the first year was kind of goof off.

After awhile I began to realize that I would be in prison for awhile, that I had to begin to do something to utilize that time, that if I didn't that the prospect of my continuing to go to prison would

loom in my future. What I did was begin to enroll in courses that were offered at the prison. I began to read extensively about things that were taking place at the time. As I could, I began to go through the process of trying to undo some of the things that I had done.

When I got out of prison, of course, I assessed my background and I thought the best thing to do would be to pursue an education, and I enrolled in Morgan State University. In about my third year at Morgan, when most of the other students were beginning to seek other things they would do once they were finished with school, I was confronted with that same dilemma. I felt as though a Bachelor's Degree would be insufficient, that I would have to develop myself even further to overcome it.

. . .

"Q Would you please explain to the members of the Board completely from the point that I interrupted you with respect to your maturation from the point of time that you left off before I asked the question.

"A I began to talk with professors around Morgan State. I explained to them my problem and told them that I wanted to go to law school. Of course, everybody told me that the difficulties that I would encounter, not only because of my background but because of the nature of law school. But no one discouraged me. Everyone told me if I wanted to do that that everything that could possibly be done to help me would be done to help me. That's exactly what was done."

After hearing testimony from the applicant and one character witness and reviewing all of the exhibits, the Board made a report and recommendation to this Court. It stated:

"The questions regarding the adequacy of disclo-

sure by the Applicant arise out of his answers to Questions No. 5 and No. 11 on the Character Questionnaire. In Question No. 5 the Applicant was asked for residences where he has lived within the last 10 years. The Applicant identified residences over a five year period but did not disclose any residences with reference to the other five year period. At the hearing before the Board the Applicant indicated that he did not regard the federal prison system as a residence, and that if he had any residence during that time he believed it was in Maryland with his mother. In Question 11 the Applicant was asked to provide a complete record of all criminal proceedings. In response he answered '11/67 U.S. District Court for the District of Maryland.' He did not identify the nature of the proceeding or the disposition.

"Clearly, the Applicant's responses to both questions were incomplete. At the hearing before the Board, in response to questions from his counsel about the reason for the incompleteness, the Applicant indicated haste in filling out the Application and a belief that the word 'residence' was subject to interpretation. (T-9, T-43). The Applicant denied that he had any conscious intention not to disclose and acknowledged that he had been counseled with regard to the importance of disclosure.

"On its face the Application indicates that it was filled out over a two or three day period. The Board therefore finds the Applicant's explanations regarding haste to be unpersuasive. It is the Board's conclusion that while the Applicant was not willing to present potentially misleading information in answer to Question No. 5 by giving his mother's address, nonetheless, the Applicant was willing to provide incomplete information with the hope, perhaps unconscious, that a less-than-thorough review of the Application might allow the prison chapter in his personal history to 'slip through.' In

a similar manner, it appears that the Applicant failed to elaborate the bank robbery in Question 11, providing instead notice which would suffice if a thorough review was made, but not information which would immediately and certainly attract attention. It is the Board's position that applicants are required to answer all questions fully and that this Applicant failed to do so. Such a failure must inevitably be weighed in considering the Applicant's Character fitness for admission to the Bar.

"The second issue relates to the Applicant's rehabilitation. There can be little doubt that the Applicant has rehabilitated himself to the extent that one can confidently predict that he will not resume a course of criminal conduct. The Applicant clearly found prison to be a cathartic experience and while he did not constitute the model prisoner in the sense that he necessarily obeyed every rule of prison, he obviously constituted the model prisoner in the sense that he determined as a result of the prison experience to basically alter his life in positive directions. This determination has been evidenced by virtually every step that he since has taken, beginning with his pursuit of an undergraduate education in prison and then at Morgan State University shortly after his release from prison, and extending to his successful pursuit of a law degree at the University of Maryland thereafter. His subsequent marriage, his continuous efforts to support himself by hard work while attending school, his miscellaneous social and community contacts evidenced both in the Character Committee transcript and to a lesser degree in the Board hearing all speak of substantial modifications of his character and patterns of behavior. The testimony of the Applicant's parole officer is persuasive that the Applicant became a very highly motivated individual with a strong inclination to become a positive, constructive member of society. The Applicant paid

a full measure for his crime and has since become a model of the type of rehabilitation which we would like to anticipate from a much larger segment of those who are incarcerated for serious offenses in their youth.

"The Applicant's rehabilitation as measured by his outstanding accomplishments since he was convicted some thirteen years ago could have been the only issue before the Board. Unfortunately, however, the decision has been made exceedingly more difficult by the Applicant's inadequate responses to the Character Questionnaire. These responses raise an issue as to whether there remains some flaw in the Applicant's character which affords a basis for excluding him from membership in the Bar. Judgments of this nature are inevitably painful because they involve compromises for the determiners. To recommend the Applicant for admission involves a compromise with a standard which the Board believes is appropriate — that applicants should fully and comprehensively disclose all requested information. To recommend against admission involves a compromise with those strong perceptions which we have as a result of the hearing that the Applicant has made strides of heroic proportions in the direction of becoming a productive member of society.

"Recognizing the parameters of this dilemma, it is the determination of the Board, with the reservation indicated, to recommend the Applicant for admission as having adequately established his fitness, rehabilitation, and present good character. The Board believes that the magnitude of the rehabilitation demonstrated adequately offsets the evidence of imperfect character represented by the answers offered by the Applicant in the Character Questionnaire. Based on the Applicant's demeanor and the full transcript of both hearings, the Board is willing to believe that the Applicant was lead by

his zeal to achieve the culmination of his rehabilitation process — namely, admission to the bar — unconsciously and in a manner which he did not recognize even at the level of the Board hearing, to exercise exceedingly poor judgment in his answers in favor of the hope that a possible obstacle to his goal might be avoided." (Footnote omitted.)

Ultimately, on 1 October 1981, the Board recommended to this Court that the applicant be admitted to the Bar.

In *In re Application of Allan S.,* 282 Md. 683, 690, 387 A.2d 271, 275 (1978), an applicant for admission to the Bar had been arrested on two occasions, once in 1966 for stealing a bottle of rum from a supermarket and again in 1971 for stealing a tape measure. In 1976, after a hearing, the Character Committee concluded from the evidence that the applicant was presently of good moral character and recommended admission. In 1977, the Board, after a hearing, concluded that the applicant did not meet the burden of proving his good moral character and recommended that he not be admitted.

In reaching its determination that the applicant possessed good moral character, this Court said:

"Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good. Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. It is not

without significance in this regard, as bearing upon moral fitness, that an applicant for admission to the bar refuses to admit his criminal conduct.

"The ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar." *In re Application of Allan S.,* 282 Md. at 690, 387 A.2d at 275 (citations omitted).

Applying these principles in that case, this Court said:

"It must be remembered that applicant's first offense occurred in 1966, eleven years prior to the hearing before the Board; the 1971 offense occurred almost seven years prior to that hearing. While there can be no doubt that each of these offenses, though petty in nature, involved moral turpitude, the applicant readily admitted that he committed the crimes even though he was never tried or convicted of either of them. In this respect, he was most candid with the Board and we cannot agree, in view of the record in this case, that the applicant did not admit that his acts were morally wrong and indefensible. On the contrary, he did so repeatedly, both before the Character Committee and the Board, and we are satisfied that he is deeply distressed that he participated in such conduct.

"In undertaking to prove his good moral character, the applicant was largely limited to the production of opinion evidence by those who know him. And letters attesting to his good character are entitled to respectful consideration. The record

before us contains letters from a number of members of the legal and lay community, all to the effect that the applicant presently possesses the good moral character required of a member of the Maryland Bar. One letter, from a former Securities Commissioner of Maryland, for whom the applicant has worked as a law clerk, contains a particularly strong endorsement of his present good moral character and he testified to the same effect at the hearing. Other similarly impressive expressions of unqualified trust in applicant's moral character are also in evidence.

"There was no evidence in the record even remotely suggesting that the applicant has been involved in any misconduct in the years following the 1971 theft offense. The inference to be drawn is that during this interim period there has been a decided improvement in the applicant's conduct and behavior." *In re Application of Allan S.,* 282 Md. at 691-92, 387 A.2d at 276 (citations omitted).

On the basis of the evidence before it, this Court held that the applicant had proven his good moral character and rehabilitation and admitted him to the Bar of this State.

This Court applied the same principles in *In re Application of A.T.,* 286 Md. 507, 408 A.2d 1023 (1979). There the applicant for admission to the Bar, as a result of drug addiction, had been involved in various separate and independent drug-related criminal offenses, the first of which occurred in February, 1959 when he was 18 years old. In 1961, he was convicted of larceny of narcotics and possession of narcotics paraphernalia, and was sentenced to a five-year term. After serving 44 months in prison, he was released. Although he thereafter attempted to abstain from drugs, he ultimately resorted to their use. In 1966, he was charged with shoplifting, a crime which he committed in an effort to obtain the money necessary to support his drug habit. He received a three month suspended sentence and was placed on probation.

By 1967, the applicant was taking methadone and stopped using illicit drugs. He was employed as an addiction counselor, and in 1978 was graduated from college. In that year he was sucessfully detoxified from methadone and stopped using that drug. In March, 1978 the applicant was granted a pardon. In 1979, he completed law school and was thereafter employed as a law clerk by a law firm where he had previously worked as a bookkeeper. That firm offered him employment as an attorney upon his admission to the Bar, an event that occurred in July, 1979.

The applicant's description of his rehabilitation was set forth by this Court as follows:

> "[H]e felt despair upon examining his life after his release from prison in June of 1965. He recognized his obsession with drugs, and said that all he could see in the future was prison and ultimately death. He was fearful of being arrested and imprisoned again, and experienced a great deal of guilt in spending money on drugs and thereby denying his wife and daughter various necessities. Out of a sense of desperation, he decided to change his life. He began to discover his capabilities. He derived great satisfaction from the successful completion of his undergraduate program, and did not want to jeopardize his educational accomplishments. The applicant told the Character Committee that he experienced and weathered law school and bar examinations and that it would be totally inconceivable for him to return to using drugs during any period of stress." *In re Application of A.T.,* 286 Md. at 512, 408 A.2d at 1026.

The Character Committee and the Board found that the applicant was fully rehabilitated and was presently of good moral character. Both recommended admission. This Court agreed, stating:

> "Applying the principles articulated in *Allan S.* to the present case, we note, in considering the

nature of the applicant's offenses, that all were directly related to his drug addiction. Furthermore, as pointed out by the Character Committee, the applicant was a user and not a dealer in drugs. In addition to the nature of the criminal offenses, we must consider the length of time that has elapsed since the criminal conduct occurred. In this case, the passage of time has been significant and substantial. The applicant's last offense occurred more than thirteen years before the Board hearing in October of 1979. Furthermore, the applicant has not used illicit drugs since August of 1967, a period of time spanning approximately twelve years. Finally, the applicant has been completely detoxified from methadone for more than six years.

"As pointed out in *Allan S.,* the crucial matter upon which we must focus is the applicant's present moral character fitness, as evidenced by the convincing record of his rehabilitation. The record wholly supports the conclusions of the Character Committee and the Board that the applicant is fully rehabilitated from his prior illegal activity. In undertaking to prove his present good moral character the applicant not only presented convincing medical evidence of his rehabilitation from drug use, but also produced character witnesses who gave particularly strong endorsements of his present good moral character. He also introduced into the record letters of recommendation from members of the legal and lay community. These letters attested to the applicant's present good character and are entitled to respectful consideration by the Court. *Allan S., supra,* 282 Md. at 692.

"Giving due consideration to the nature of the applicant's offenses, the time of their commission, the circumstances involved, the fact that the burden rests upon the applicant to prove his good moral character, and most importantly, the convincing evidence of the applicant's rehabilita-

tion, we think that he has established the requisite present moral character fitness that justifies his admission to the Bar of Maryland." *In re Application of A.T.,* 286 Md. at 515-16, 408 A.2d at 1028.

The same principles enunciated in *In re Application of Allan S.* and *In re Application of A.T.* are applicable here. In making our own independent evaluation of the applicant's moral character, we have considered that the applicant's only offense occurred in 1967, 14 years before the hearing before this Court. At the time of the incident, the applicant was only 19 years old. While there can be no doubt that the applicant's offense was serious and involved moral turpitude, it must also be remembered that this crime constituted a single, isolated episode in the applicant's life.

The applicant readily admitted that he himself was solely responsible for his participation in and commission of the crime. While he was unarmed and served only as the driver of the get-away car, he recognized no difference in the degree of culpability between himself and the other two persons involved in the crime. Thus the applicant admitted that his criminal acts were morally wrong and indefensible.

We recognize that the applicant failed to provide complete information on his application for admission to the Bar. We note, however, that he made full disclosure of his criminal conviction and incarceration on his application to law school. On his application for admission to the Bar, he provided sufficient information to alert the Committee to the need for further investigation and inquiry. When his alleged failure to fully disclose was called to his attention, he conceded that the information he provided was incomplete and then voluntarily provided the requisite information. Throughout the proceedings he repeatedly asserted that he did not consciously intend to conceal information regarding his criminal activity. Under these circumstances, we cannot conclude that the applicant did not possess a sufficient degree of candor to qualify for admission to the Bar.

With respect to the applicant's rehabilitation, he himself attested to the attitudinal changes that occurred with

respect to a societal need for order and his personal values and goals. He recognized that he had to change and he did change from a person with no respect for the law to a person who wished to devote himself to the law. He began to read books, got married, and graduated from college and law school. Throughout this period, he held various responsible jobs, including a position with the Prisoners' Assistance Program of the Legal Aid Bureau, all of which he performed satisfactorily. Numerous friends, employers and teachers, including the Dean of the University of Maryland School of Law, endorsed his present good moral character. There can be no question that the applicant has been rehabilitated.

Giving due consideration to the nature of the applicant's offense, the time of its commission, the other circumstances involved, the fact that the burden rests at all times upon the applicant to prove his good moral character, and, most important, the convincing evidence of the applicant's rehabilitation, we conclude that he has established his present moral character and fitness to be admitted to the Bar of this State. Upon successful completion of the requisite bar examination, he shall be admitted.

*It is so ordered.*

*Digges, J., dissenting*

I had looked forward with pleasurable anticipation to penning my final words as a member of this Court in an opinion considering a much more tranquil subject than is involved here, and one expressing the unanimous views of my colleagues, each of whom I hold in the highest esteem. However, such is not to be, for I am so appalled by the action the Court takes today in rolling out a red carpet in order that an unpardoned armed bank robber may tread smoothly on his way to becoming a member of the Bar of this State, that I am impelled to raise a loud voice, albeit an expiring one, in protest. This revulsion to the action of the majority here is not an aberration on my part, for I have consistently

expressed similar views in the past [1]; it has merely been intensified to the point of shock when I contemplate that an applicant who has committed such a dastardly crime as armed robbery is soon to become a member of the Maryland Bar. In my dissenting remarks in *In re Application of Allan, S.,* I wrote:

> Since the time of Moses, if not before, "Thou shall not steal" has been understood as one of our basic legal and moral tenents. The majority nevertheless apparently believes that there is no great harm in having a thief or two [and now, I must sadly add, an armed robber or two] admitted to the Maryland Bar. . . . With its action, I believe the Court takes a giant leap backward, abdicating its high responsibility to assure the public that nothing in the background of an applicant for bar membership has been discovered to reasonably indicate that the prospective attorney might not be possessed of the basic qualities of honor traditionally associated with members of the bar of this State. [282 Md. 683, 693, 387 A.2d 271, 277 (1978) (citations and footnote omitted).]

---

1. See In Re Application of K.B., 291 Md. 170, 434 A.2d 541 (1981) (opinion by Rodowsky, J., joined by Digges, J.) (applicant pleaded guilty to credit card fraud two weeks after applying for admission to Maryland Bar); In Re Application of A.T., 286 Md. 507, 516, 408 A.2d 1023, 1028 (1979) (Digges, J., concurring in dissent of Smith, J.) (applicant, previously addicted to various narcotics, committed numerous thefts and drug possession offenses); In Re Application of Howard C., 286 Md. 244, 245, 407 A.2d 1124, 1124 (1979) (Digges, J., concurring in dissent of Smith, J.) (applicant committed two shoplifting offenses, one during college and one during law school); In Re Application of David H., 283 Md. 632, 641, 392 A.2d 83, 88 (1978) (Digges, J., concurring) (applicant admitted to shoplifting and breaking into automobiles on numerous occasions); In Re Application of Allan S., supra, (Digges, J., dissenting) (applicant committed shoplifting on two occasions, one after graduation from law school); Maryland St. Bar Ass'n v. Agnew, 271 Md. 543, 318 A.2d 811 (1974) (opinion by Digges, J.) (member of Maryland Bar, shortly after resigning as Vice President of the United States, pleaded *nolo contendere* to income tax evasion); Bar Ass'n v. Marshall, 269 Md. 510, 307 A.2d 677 (1973) (opinion by Digges, J.) (attorney disbarred for misappropriating client funds); Balliet v. Balto. Co. Bar Ass'n, 259 Md. 474, 270 A.2d 465 (1970) (opinion by Digges, J.) (attorney disbarred after conviction of larceny after trust for converting a client's funds to his own use).

The right to membership in the legal profession is not one that adheres to every citizen as does the right to engage in an ordinary trade or business. It is a unique privilege extended only to those who demonstrate that they have ascended a special plateau with respect to both moral character and intellectual attainment. And, if forced to choose between the two, moral character, in my view, is of greater importance to the public and to the proper administration of justice than is legal learning. Learning may be acquired in later years by diligent study; but if an applicant comes to the bar with bad moral character, he is likely to retain it, for an inherent behavioral trait is less susceptible to change than is a person's level of knowledge attainment. Moreover, once admitted to the bar, an attorney is subject to far less intense official scrutiny concerning his character than that which occurs during the application process. Thus, an inadequate screening at this stage presents the potential to cause untold misery to the public and to sour its view of the legal profession in general as well as the administration of justice in particular. The moral character required of every lawyer of this State was summarized by a unanimous Court in *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 548-49, 318 A.2d 811, 814 (1974) using the following words which have equal significance whether applied in a disbarment (as was *Agnew*) or in an application for initial admission proceeding:

> [L]ittle else benefits the legal community more from repetition than does a recitation of an attorney's high moral obligation. . . .
>
> "No man can ever be a truly great lawyer, who is not in every sense of the word, a good man. . . . There is no profession in which moral character is so soon fixed as in that of the law; there is none in which it is subjected to severer scrutiny by the public. . . . From the very commencement of a lawyer's career, let him cultivate, above all things, truth, simplicity and candor; they are the cardinal virtues of a lawyer." *G. Sharswood, Professional Ethics,* 168, 169 (1844).

> Few vocations offer as great a spectrum for good and honorable works as does the legal profession. The attorney is entrusted with the life savings and investments of his clients. He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an advisor, and an advocate. However, the great privilege of serving in all of these capacities does not come without the concomitant responsibilities of truth, candor and honesty. . . . The administration of justice under our adversary system largely depends upon the public's ability to rely on the honesty of attorneys who are placed in a position of being called upon to conduct the affairs of others both in and out of court.

This grave responsibility to protect the public trust rests ultimately on our shoulders, for we, largely at our own direction, assumed the task years ago and we should not take it lightly.

In this case, we are faced with an applicant who committed armed robbery while an adult. He and two other men, having carefully planned the crime, travelled from Baltimore to a rural area of Virginia and robbed a bank, using a sawed off shotgun to terrorize those present. Upon conviction in federal court, G.L.S. received a sentence of 10 years imprisonment under conditions that would have permitted release for good behavior at any time. The record discloses that, rather than taking advantage of this act of leniency, the applicant created such a prison disciplinary problem that he spent time in solitary confinement, was transferred to increasingly more secure prisons, was, because of his conduct, denied parole on "more than five occasions," and finally, was not released until he had served 6½ years. In my view, when the applicant is shown to be a convicted armed robber, one of the more heinous crimes known to our law, or guilty of any other crime of that ilk, my answer to the query — "Whether after the conduct of this man, it is proper that he should [become] a member of [the

legal] profession"[2] is emphatically *no,* or at least, almost never. There must be offenses so serious that the applicant committing them cannot again satisfy the court that he has become trustworthy; if there are such crimes, this is surely one of them. See *In re Keenan,* 314 Mass. 544, 50 N.E.2d 785, 788 (1943). Moreover, in this case, the sordid nature of the applicant's act alone need not provide the only basis for precluding bar admission, for the Board found that he had been less than candid, if not blantantly deceitful, by not revealing his conviction and imprisonment in answers to questions concerning prior addresses and criminal proceedings in the very application for bar admission addressed to this Court which we now consider. And, when the applicant was confronted with this obvious fact, the examiners also found "unpersuasive" his explanation to them, made under oath, that he had filled out the application in a hurry with no time to complete this aspect of the form.[3] The majority glosses over these facts by pointing out that G.L.S. had made full disclosure of his criminal past in his application for admission to law school. This is irrelevant here, for it fails to answer the serious matter of non-disclosure to this Court, which ultimately bears the responsibility to protect the public by screening bar applicants, not the law school. The majority also weakly points out that G.L.S. provided sufficient hints in his answer to "alert the Committee to the need for further investigation and inquiry" into his sordid past. This is far from enough. The application on its face requires complete disclosure, and this Court or its Board should not be required to search the form with a magnifying glass for clues indicating that there should be a more searching inquiry into the applicant's past. I have already pointed out that, in my view, "[t]otal frankness throughout the application procedures is ... a *sine qua non* for admission to the Bar." *In Re Application of Allan S.,* 282 Md.

---

2. Ex parte Brownshall, 2 Cowp. 829 (1778), (opinion by Lord Mansfield).

3. Of course, those who wrote letters on behalf of the applicant as well as the character committee were unaware at the time they vouched for his good character that the applicant was subsequently found by the Board of Law Examiners to be untruthful.

683, 697, 387 A.2d 271, 279 (1978) (Digges, J., dissenting). I do not stand alone in this regard, for Chief Judge Murphy, expressing the majority view in *Allan S., supra,* also explained that "[w]hile there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character, we have said that no moral character qualification for Bar membership is more important than truthfulness and candor." *Allan S., supra,* 282 Md. at 689, 387 A.2d at 275. As G.L.S. has been shown here to be veraciously lacking, he should not be permitted to add his name to the rolls of the Bar of this State — a bar which, from the mid-seventeenth century, has enjoyed such an illustrious stature.[4] *See e.g., In Re Application of K.B.,* 291 Md. 170, 434 A.2d 541 (1981).

Thus, today's decision, in effect, reduces the oft stated requirement that members of the bar possess high morals at admission, and retain them thereafter, to a mere platitude, lacking in substance, delivered as commencement day rhetoric upon graduation from law school or bar admission ceremonies. Great efforts have been expended by the legal profession generally and this Court, with the aid of the General Assembly, in recent years to bolster the people's trust and confidence in their courts and the attorneys which, in our adversary system, are necessary to service them. Having been invested with responsibility for the regulation of admission to the bar, this Court created an elaborate network of investigators under the aegis of the character committee to screen the moral integrity of new applicants, while the Board evaluates both character and intellectual ability of prospective bar admittees. Once an attorney is admitted to practice in this State, he must abide by the Code

---

**4.** In addition, the petitioner remains unpardoned for his crime. When asked why he had not sought from the President of the United States a pardon for his federal criminal act before applying for admission to the bar, the applicant responded that he had decided to pursue the bar admission first so that if successful, he would be able to use the fact as an aid in obtaining a pardon. In my view, the applicant has twisted his priorities in this respect, for this Court should entertain no request for bar admission or reinstatement while the applicant remains an unpardoned felon. See Maryland St. Bar Ass'n v. Boone, 255 Md. 420, 433-34, 258 A.2d 438, 444-45 (1969).

of Professional Responsibility which we adopted several years ago; we established the Attorney Grievance Commission to ferret out and prosecute disciplinary actions against any attorney who fails to abide by its precepts. And finally, we have created a client security trust fund supported by mandatory contributions from members of the bar, which has gained national recognition, to reimburse those who have been victimized by the few unscrupulous lawyers. If our recent cases such as *Allan S., supra,* and *In Re Application of Howard C.,* 286 Md. 244, 407 A.2d 1124 (1979), did not, then this decision and those which because of its precedent will inevitably follow in its wake certainly constitute giant steps toward nullifying the worthy objectives of the various measures just articulated. Let us not forget that whenever there is a clash between what best serves the interest of the individual applicant and that of the public, the individual interest must be put aside. The majority in this opinion and in similar others has misconceived their public duty by engaging in a weighing process, comparing the applicant's good deeds with his bad and "rewarding" him with bar admission when they think the scales are tipped in his favor, while at the same time completely ignoring the paramount public interest. We have moved much too far in recent years from promptly acting to prevent *any* unscrupulous persons from practicing law in this State (including one who placed slugs in parking meters, see *Fellner v. Bar Ass'n,* 213 Md. 243, 131 A.2d 729 (1957) to admitting such persons — first the petty thieves and now, armed robbers. I fear this case portends the admission in the not too distant future of not only thieves and robbers but also kidnappers, terrorists, rapists, and murderers unless the trend it represents is checked. Although I will not be present to lend a voice in aid of reversing this unfortunate new pattern, others, hopefully, will succeed where I have today failed.

Judges Smith and Rodowsky authorize me to state that they join in the views expressed herein.