**Thomas Richard LEFLY, Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 06PDJ096.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Aug. 2, 2007.

Attorney Regulation. Following a Readmission Hearing, a Hearing Board readmitted Petitioner Thomas Richard Lefly (Attorney Registration No. 38821) to the practice of law and the Presiding Disciplinary Judge administered the oath of admission to Petitioner on August 21, 2007. The Colorado Supreme Court previously disbarred Petitioner on August 28, 1995, effective September 28, 2005. Petitioner's underlying disciplinary history involved mismanagement of trust accounts during the 1980s and early 1990s. He also had a history of severe mental and emotional difficulties. The Hearing Board found clear and convincing evidence that Petitioner had complied with all applicable disciplinary orders, had provided sufficient evidence demonstrating his fitness to practice law, and had proved that he is rehabilitated. The Office of Attorney Regulation Counsel stipulated to his readmission at the close of the evidence. The Hearing Board also implemented certain conditions of readmission to facilitate Petitioner's successful return to the practice of law.

## OPINION AND ORDER RE: READMISSION PURSUANT TO C.R.C.P. 251.29

On June 26–27, 2007, a Hearing Board composed of Lee Medina, Barbara Weil Laff, both members of the Bar, and William R. Lucero, the Presiding Disciplinary Judge ("PDJ"), held a Readmission Hearing pursuant to C.R.C.P. 251.29(d) and 251.18. Eugene L. Deikman represented Thomas Richard Lefly ("Petitioner") and Margaret Funk represented the Office of Attorney Regulation Counsel ("the People") in these proceedings. The Hearing Board now issues the following Opinion and Order Re: Readmission Pursuant to C.R.C.P. 251.29.

## I. *ISSUE*

An attorney subject to readmission proceedings under C.R.C.P. 251.29 must prove rehabilitation by clear and convincing evidence. Much of the testimony at the hearing pertained to Petitioner's mental health at the time of the events leading up to his disbarment, and the possibility that the stress of

practicing law might trigger a relapse of mental illness. The issue before the Hearing Board is whether Petitioner has made the necessary changes in his life so that the stress of law practice is less likely to trigger a relapse of the actions that led to his disbarment in 1995.

## DECISION OF HEARING BOARD: ATTORNEY READMISSION GRANTED.

## II.  PROCEDURAL HISTORY

Petitioner was disbarred from the practice of law in case number 94SA0406 on August 28, 1995, effective September 28, 1995.[1] Petitioner filed a "Verified Petition for Readmission" on November 28, 2006, more than eight years from the effective date of his disbarment. The People filed an "Answer to Verified Petition for Readmission" and agreed to the technical sufficiency of the petition, but took no position regarding Petitioner's readmission pending an investigation regarding whether Petitioner had undertaken the steps necessary to show that he possessed all of the qualifications required of an applicant for admission to the Bar of Colorado. Prior to the Readmission Hearing, the People stipulated that Petitioner had provided clear and convincing evidence of compliance with all applicable disciplinary orders and with all provisions of the requirements of C.R.C.P. 251.29(a) and (c).[2] Following the Readmission Hearing, the People stipulated that Petitioner had provided clear and convincing evidence of rehabilitation, and requested that his petition for readmission be granted.

At the Readmission Hearing, the PDJ admitted Stipulated Exhibits 1–13 and A–M. The Petitioner also offered Exhibit 14, which the PDJ accepted into evidence. Petitioner testified on his own behalf and presented ten witnesses, both lay and professional, in support of his petition. Among those was John Martinez, a clinical psychologist. The People presented one witness, David S. Wahl, M.D.,

1.  *See* Stipulated Exhibit D.

2.  On April 28, 2006, the Colorado Supreme Court Board of Law Examiners Petitioner notified Petitioner that he had satisfactorily performed

a physician who is a board-certified neurological psychiatrist.

## III.  FINDINGS OF FACT

The Hearing Board finds the following facts by clear and convincing evidence.

The Petitioner took and subscribed the Oath of Admission and was admitted to the Bar of the State of Colorado on May 19, 1975. Petitioner is subject to the jurisdiction of the Colorado Supreme Court and the Office of the Presiding Disciplinary Judge in these readmission proceedings.

As part of this readmission proceeding, Petitioner agreed to and participated in an independent medical evaluation by Davis S. Wahl, M.D., a licensed Colorado psychiatrist whose name was pre-approved by the People. Dr. Wahl has opined, and the People stipulate, that Petitioner is capable of returning to the practice of law from a psychiatric perspective.

Petitioner possesses all of the qualifications required of applicants for admission to the Bar of Colorado, fully considering the previous disciplinary action against him. Petitioner has complied with all applicable disciplinary orders and with all provisions of the Colorado Rules of Civil Procedure regarding attorney discipline. Furthermore, he has no medical or psychological bases that impair his abilities to fulfill his responsibilities as an attorney.

Petitioner has maintained professional competence through employment as a claims adjuster for independent claims adjusting companies, work as a paralegal for a law firm, study in preparation for the bar examination, successful completion of the bar examination, and attending numerous adjuster and continuing legal education courses.

### A.  Petitioner's History Leading to Disbarment

1.  Petitioner stipulated before the hearing panel that disbarred him that he had

formed the Colorado Bar Examination given on February 21, 2006. Petitioner has also passed the Multistate Professional Responsibility Examination.

converted client trust funds. The only issue was the appropriate sanction. The panel heard the testimony of Petitioner, two members of the Church of Scientology, and a psychologist. The panel and the Supreme Court found Petitioner's witnesses sincere and credible. These witnesses testified to the extent and severity of Petitioner's emotional problems that they evaluated and treated intensively, resulting in marked improvement.

2. Petitioner, a personal injury lawyer, mismanaged his trust accounts in which he had deposited client settlement funds since 1982. Recognizing he was experiencing severe mental and emotional difficulties in 1983, Petitioner counseled with two psychologists. In 1984, he asked to withdraw from two cases, citing disability as the reason. Opposing counsel filed a request for a disability investigation from the Supreme Court Grievance Committee and Petitioner was evaluated by a psychiatrist in 1984. He thought he had recovered from his emotional difficulties, but did not disclose his trust account deficiencies to the psychiatrist. He continued seeing a psychologist until 1986 or 1987. In 1985, he brought his trust accounts in balance, but again began using funds from those accounts in 1988, while he was suffering severe emotional distress. He again obtained counseling, but perceived that it made him worse.

3. In 1990, Petitioner joined the Church of Scientology, in part because he believed traditional psychotherapy and medication were not helpful to him. To the time of the hearing, he participated in a structured program provided by the church including a form of counseling called "auditing" to address his emotional and economic problems. He devised a plan to repay his trusts accounts, but the plan failed. Through funds from loans and inheritance, he again brought his trust accounts into balance in December 1991.

4. In June 1991, Petitioner received a $175,000.00 settlement on behalf of Mr. Aravelo, who could not speak English. Exploiting the language barrier, Petitioner told Mr. Aravalo that the funds had not been received and transferred $87,000.00 from his trust to his operating account. Petitioner deposited $65,000.00 of that into an account directed by a loan agent to obtain a lender or lenders to loan him sufficient funds to bring the trust accounts into balance. This effort failed, but the loan agent retained $6,000.00 as a commission. He deposited the balance in Mr. Aravalo's trust account. Using client funds in part on June 11 and August 22, 1991, Petitioner paid Mr. Aravalo the client's share of the settlement.

5. In January 1991, Petitioner settled a workers compensation claim on behalf of Doris Mitchell for $55,000.00. He endorsed the warrant as his client's attorney in fact and deposited it into a trust account. He withdrew $11,000.00 in attorney fees in January and February 1991, but did not notify Ms. Mitchell until she informed the Colorado Compensation Insurance Division in September that she had not received her funds. On October 25, 1991, using personal funds, Petitioner paid Ms. Mitchell a sum representing her share plus interest. He also refunded a retainer she had paid him.

6. The Supreme Court affirmed the panel's findings that these acts violated DR 1–102(A)(1) (violation of a disciplinary rule); DR 1–102(A)(4) (conduct involving fraud, dishonesty, deceit or misrepresentation); DR 6–101(a)(3) (neglect of a legal matter entrusted to him); DR 6–102(B)(1) (neglect of a legal matter entrusted to him); DR 9–102(A) (all funds paid to a lawyer or law firm shall be deposited in one or more interest-bearing insured depository accounts); DR 9–102(B)(1) (failure to properly notify a client of the receipt of funds ... and render appropriate accounting to his clients regarding them); DR 9–102(B)(3) (failure to maintain complete records of all funds ... and render appropriate accounting to his clients regarding them); and DR 9–102(B)(4) (failure to promptly pay or deliver to the client as requested by a client the funds ... in possession of the lawyer which the client is entitled to receive).

7. Two of the three hearing panel members recommended disbarment. One member recommended a three-year suspension. The differences of opinion revolved around the mitigating factor of whether Petitioner's

misconduct was caused by, or affected by, a mental disability. The Supreme Court, though finding that Petitioner's "personal and emotional problems were certainly severe," in view of the numerous and grave instances of the misconduct including misappropriation of client funds, the appropriate sanction was disbarment.

## B. *Evidence Presented in Support of the Petition for Readmission*

Petitioner testified on his own behalf in these proceedings. Though trained as a teacher, he began working as an insurance adjuster in the 1970's, while attending law school at night. He became a licensed attorney in 1975, handling personal injury cases. He candidly discussed the issues that led to his mishandling of client funds in the 1980's. As Petitioner's practice grew, he hired more staff to handle the workload, and used client funds to pay office expenses. His trust accounts first fell out of balance in December 1982. He knew it was a serious offense, and tried to bring those funds back into balance.

In 1983, Petitioner knew he was suffering from serious mental health issues, including depression. He sought counseling from Edward A. Steinberg, Ph.D., approximately twice a week for six months, and then weekly until 1986. Petitioner did not disclose his trust account deficiencies to Dr. Steinberg. Although Dr. Steinberg prescribed him an antidepressant, Petitioner did not take the medication.

In 1984, difficulties in Petitioner's second marriage led to a mental breakdown, which caused him to withdraw from two cases, citing disability. Opposing counsel in one of those cases filed a request for disability investigation with the Grievance Committee, and Petitioner was ordered to see Frederick Miller, a psychiatrist. Dr. Miller found Petitioner to be "normal." Petitioner did not discuss his trust fund issue with Dr. Miller because he "did not talk about it" with others.

Petitioner once more began using funds from client trust accounts in approximately 1988, again describing relationship problems as the cause of the overspending which led to the perceived need to use that money. Petitioner did not confront his trust account issues until he began the process of "life auditing" through the Church of Scientology in 1990. Petitioner turned to the Church of Scientology after reading the book *Dianetics* by L. Ron Hubbard, the founder of the Church of Scientology. Petitioner testified that he found the "auditing" process, similar to psychotherapy, to be very helpful to him in facing his ethical and personal issues.

In 1990, a Church of Scientology staffer helped Petitioner create a plan to repay his trust account. The plan did not work, according to Petitioner, largely because he had to pay so much money to the Church of Scientology for his auditing classes. He did, however, manage to bring his trust account into balance by January 1992, largely by borrowing money and cutting costs in his law practice. By November 1991, all clients had been repaid, with interest, and all costs were repaid by January 1992.

Petitioner also took classes to become an auditor himself. He performed audits on approximately 10–25 other people. He left the Church of Scientology in 1997, finding that it was very expensive, and no longer serving his needs.

Following his disbarment, Petitioner renewed his teaching license. He advised the Colorado Department of Education of his disbarment, and the reasons for it.[3] Petitioner worked as a substitute teacher in Jefferson County, Colorado and at Catholic schools around the Denver metropolitan area. He also worked as a telemarketer. While he was hired as a full-time math teacher at a Catholic school, he found that he could not control the classroom, and quit the job after one month.

Petitioner thereafter returned to the insurance adjusting field, working as a Senior Claims Adjuster for Gates Claims Service from September 1998 to September 1999, for Custard Insurance Adjusters until April 2001, for Crum & Forster Insurance Company as a Claims Representative and Liability Examiner until January 2004, and for West-

3. *See* Stipulated Exhibit 2.

ern Guaranty Fund until August 2004. During this time, Petitioner attended seminars regarding insurance law and mediation, and worked with attorneys to settle client claims. He never handled any client funds himself.

Petitioner did not advise any of these employers of his disbarment, because they did not ask him a direct question about why he left the practice of law. When he did tell a prospective employer about his disbarment, he was not hired. When he applied for an insurance adjuster's license in Wyoming,[4] he answered, "no" to the question, "Has any previous license or application for license been refused, suspended, revoked or renewal or continuance denied?" because he believed the question to refer only to insurance licenses.

After he filed his Application for Admission to the Bar in December 2004, Petitioner worked part-time for Crocker Claims Service as a senior claims adjuster in January 2005. Petitioner took the February 2005 bar examination, but did not pass. In June 2005, Petitioner began working as a law clerk and paralegal for David R. Calvert, performing legal research, drafting pleadings, motions, discovery, and memoranda of law. He also filed documents on behalf of Mr. Calvert, using the LexisNexis File and Serve (state court) and PACER (federal court) systems.

Petitioner took the July 2005 bar examination, and did not pass. Petitioner worked full-time for Mr. Calvert from June 2006 through December 2006. He advised Mr. Calvert of the reasons for his disbarment. During that time, he also attended continuing legal education programs including ethics programs. Petitioner devoted himself full-time to studying for the February 2006 bar examination, which he passed. He continues to work part-time for Mr. Calvert, and occasionally as an adjuster for Crocker Claims Service as needed.

If he is readmitted, Petitioner would like to work as an associate with a personal injury or bankruptcy firm, but understands that this is not likely, given his disciplinary history. He would rather not practice alone, unless there were other attorneys available for advice and/or monitoring. Petitioner testified that James F. Pamp, an attorney in good standing, has offered to monitor Petitioner's practice and trust accounts if he is readmitted.

Petitioner testified that he believes that he is rehabilitated, a more ethical person, and able to control stressors in his life better than when he was disbarred. First, through his auditing and the experience of disbarment, he understands that client money belongs to clients. Second, he is very careful in his personal relationships with women, and is trying to stay away from relationships that are not healthy. Although his most recent relationship has ended, the termination did not cause the type of emotional breakdown he experienced in the late 1980's. Third, he does not have the financial pressures he had in the late 1980's with judgments, tax liens, child support, and high business overhead. He knows how to handle his finances differently, having had to live so frugally over the past twelve years. Fourth, he is reconnecting with his Jewish roots, and is currently in the process of converting to Judaism. Fifth, he recognizes the need for counseling, and has made arrangements to see Dr. Martinez to "check in" if he feels stress in connection with work or his personal life, or if required to do so as a condition of his readmission.

John Martinez, Ph.D., was offered, and accepted by the PDJ, as an expert witness on behalf of Petitioner. Dr. Martinez performed an evaluation of Petitioner both prior to his disbarment, and again in preparation for the readmission hearing. Dr. Martinez testified that he first saw Petitioner in 1983. At that time, Dr. Martinez administered the Minnesota Multiphasic Personality Inventory ("MMPI"), and found that Petitioner showed deviant responses, demonstrating impulsivity and thought disorganization. When he saw Petitioner for an evaluation in 2005, he administered the MMPI–II assessment, and found Petitioner to be functioning normally.[5] Dr. Martinez attributes the change to psychotherapy and medication. In Dr. Martinez's opinion, Pe-

---

4.  *See* Stipulated Exhibit 6.

5.  *See* Stipulated Exhibit 3.

titioner is mentally qualified to practice law, and does not need mandated counseling. While there is a possibility of a relapse in patients who have had a breakdown such as Petitioner suffered, he has not had a relapse in fourteen years, and the chance of relapse decreases with treatment.[6]

Petitioner presented testimony of witnesses with whom he had worked as an insurance adjuster during his disbarment. Charles Peek, Senior Vice President and District Manager of Custard Insurance, testified that he supervised Petitioner full-time for one year, and part-time for part of another. He testified that he found Petitioner to be highly trustworthy, honest, and a person of integrity. Petitioner had not told Mr. Peek that he had been disbarred. Mr. Peek understood that Petitioner had left the practice of law because he was not successful, though Mr. Peek did not hear this from Petitioner. Had Mr. Peek known of the disbarment before hiring Petitioner, he would have spoken with his company's attorneys to determine whether it would have been a bar to hiring Petitioner. It was not Mr. Peek's practice to ask about licenses other than the adjuster's licenses required by Wyoming and some states other than Colorado.

Julie Ann Christensen testified by deposition.[7] She was formerly the Claims Director of Crum & Forster, and supervised Petitioner in January of 2003. She testified that she gave Petitioner a performance evaluation in February of 2003 showing that he met expectations. During the time she supervised him, he never fell below her expectations. She felt that Petitioner was a good, solid performer, and she promoted him. The company conferred $25,000.00 settlement authority on each of its adjusters automatically, though they never handled the money personally. Ms. Christensen testified that she did not know that Petitioner had been disbarred, and might not have hired him if she had known. It is not, however, a question that the company asks applicants.

Gary Hale, a claims supervisor at Western Guaranty Fund Services, testified that he supervised Petitioner. Western Guaranty Fund Services adjusts claims for defunct insurance companies. Petitioner was a very good adjuster, who understood the statutes, and could explain the case status to attorneys and insureds. Mr. Hale did not know that Petitioner had been disbarred until these proceedings, but stated that it would not have mattered to him. Petitioner did not handle money in his work for Western Guaranty.

Frank Boissoneau testified that he had also supervised Petitioner at Western Guaranty Fund Services. He testified about Petitioner's good organizational skills. He did not know that Petitioner had been disbarred, but it did not affect his high opinion of Petitioner.

Mark Spradlin testified that he employed Petitioner as a claims adjuster at Custard Insurance in the Denver office, and had daily contact with the two adjusters and one clerk in the office. Petitioner handled between 25 and 40 cases at any one time, dealt with lawyers and insureds, and handled the cases well. Mr. Spradlin knew prior to the hearing that Petitioner had been disbarred, and believes that he is now fit to practice law.

David Calvert, an attorney in good standing in the community, testified on behalf of Petitioner. Mr. Calvert testified that Petitioner worked for him as a full-time law clerk, until Mr. Calvert needed an associate who could go to court, and then part-time. Mr. Calvert reviewed and signed all pleadings and documents prepared by Petitioner, who never overstepped his boundaries as a law clerk. Petitioner was honest, trustworthy, and had integrity. Petitioner told Mr. Calvert about his disbarment and Mr. Calvert acted as a mentor through the readmission process. Mr. Calvert testified that he believes Petitioner is professionally competent and rehabilitated, and fit to practice law.

Diane Lefly, Petitioner's ex-wife, testified that Petitioner was devastated by the consequences of his actions and the subsequent disbarment, and has worked as hard as he could to provide for his son. He has met his

---

**6.** *See* Stipulated Exhibit 5.

**7.** *See* Stipulated Exhibit 14.

child support obligations and contributed what he could to his son's education, though that was not very much while his son was in college. She believes that Petitioner has done much to rehabilitate himself, including studying ethics through the Church of Scientology, counseling, and going through the readmission process.

Elliott Lefly, Petitioner's son, testified that he has seen a change in his father as a result of his disbarment. Petitioner is adamant about taking care of his finances, discusses ethics, and is very clear about the mistakes he made. He believes that his father is rehabilitated.

Finally, the Hearing Board heard from James F. Pamp, an attorney in good standing in the community. Mr. Pamp testified that he has known Petitioner as an insurance adjuster. He has been a friend to Petitioner following his disbarment, making sure that Petitioner attended social gatherings and cultural events, and supporting his efforts to find work. Mr. Pamp has agreed to act as a practice and financial monitor for Petitioner, should Petitioner be readmitted to the practice of law.

### C. The People's Evidence, David S. Wahl, M.D.

Dr. Wahl conducted a psychiatric evaluation of Petitioner and completed a report on May 3, 2007.[8] In Dr. Wahl's opinion, there is no current psychiatric condition that interferes with Petitioner's ability to practice law. However, Dr. Wahl believes Petitioner may be vulnerable to a recurrence of the condition that caused him to commit the acts that led to his disbarment.

Dr. Wahl feels that Petitioner suffered a significant psychiatric break of several years in the late 1980's that affected him socially and professionally. He therefore lives with a moderate risk of the return of his symptoms. This means that Petitioner is vulnerable to the stresses of a renewed law practice, and Dr. Wahl would urge careful monitoring of work responsibilities, and introduce medication early at the first sign of trouble, because of Petitioner's age.

Nevertheless, because there is no active illness at present, Dr. Wahl believes Petitioner is fit to practice law, with some monitoring. The psychological monitor should be someone who is open to using medication if necessary to manage the risk of relapse. Because mental illness can affect brain functioning at all levels, it is important that Petitioner seek help at the first sign of distress, before his judgment becomes impaired. A practice monitor should be able to assist Petitioner in this, but the practice monitor must be willing to tell Petitioner when the monitor thinks Petitioner is having trouble.

## IV. LEGAL ANALYSIS

C.R.C.P. 251.29. provides in relevant part:

(a) Readmission After Disbarment.

A disbarred attorney may not apply for readmission until at least eight years after the effective date of the order of disbarment. To be eligible for readmission the attorney must demonstrate the attorney's fitness to practice law and professional competence, and must successfully complete the written examination for admission to the Bar. The attorney must file a petition for readmission, properly verified, with the Presiding Disciplinary Judge, and furnish a copy to the Regulation Counsel. Thereafter, the petition shall be heard in procedures identical to those outlined by these rules governing hearings of complaints, except it is the attorney who must demonstrate by clear and convincing evidence the attorney's rehabilitation and full compliance with all applicable disciplinary orders and with all provisions of this Chapter. A Hearing Board shall consider every petition for readmission and shall enter an order granting or denying readmission.

People v. Klein, 756 P.2d 1013, 1016 (Colo. 1988) interprets the language of the prior rule governing readmission to the bar, C.R.C.P. 241.22, and sets forth criteria which must be considered in readmission proceedings in order to evaluate an attorney's rehabilitation. Klein requires:

8. See Stipulated Exhibit 4.

Any determination of that issue [rehabilitation] must include consideration of numerous factors bearing on the respondent's state of mind and ability, such as character, conduct since the imposition of the original discipline, professional competence, candor and sincerity, recommendations of other witnesses, present business pursuits of the respondent, the personal and community service aspects of the respondent's life, and the respondent's recognition of the seriousness of his previous misconduct.

Rehabilitation for purposes of attorney reinstatement and readmission to the bar has been defined as "the reestablishment of the reputation of a person by his or her restoration to a useful and constructive place in society." *Goff v. People*, 35 P.3d 487, 494–95 (Colo.O.P.D.J., August 4, 2000), *citing* Avrom Robin, *Character and Fitness Requirements for Bar Admission in New York*, 13 TOURO L. REV. 569, 583 (1997) (*quoting In re Cason*, 249 Ga. 806, 294 S.E.2d 520, 522–23 (1982)). Other factors which are considered are the applicant's age at the time of the offense and the likelihood that the applicant will repeat the behavior in the future. *Id.* Courts, including those in Colorado, focus upon the applicant's current mental state. *Id.; See Klein*, 756 P.2d at 1016.

◼ Imposition of discipline against an attorney includes a determination that some professional or personal shortcoming existed upon which the discipline is premised. *Goff*, 35 P.3d at 495–96; *Avila v. People*, 52 P.3d 230, 234 (Colo.O.P.D.J., July 22, 2002). The shortcoming may have resulted either from personal deficits or from a combination of personal deficits and professional and/or environmental inadequacies. *Id.* It necessarily follows that the analysis of rehabilitation should be directed at the professional or moral shortcoming which resulted in the discipline imposed. *Id.*

◼ Readmission, however, will not be granted automatically because the applicant has not engaged in further misconduct following disbarment. *See In re Sharpe*, 499 P.2d 406, 409 (Okla.1972). The foremost concern must be protecting the public welfare. Each case for readmission must be reviewed on its own merits, and will fail or succeed on the evidence presented and the circumstances peculiar to that case. *Goff*, 35 P.3d at 495, *citing In re Cantrell*, 1989 OK 165, 785 P.2d 312, 313 (Okla.1989). The Hearing Board must determine that rehabilitation has already occurred, not that it may occur in the future. While an order granting readmission may include conditions, which must be followed by the readmitted attorney, it is a prerequisite to any such order that the attorney has already been successfully rehabilitated. *See* C.R.C.P. 251.29(b). Proof of anticipated changes will not satisfy this requirement. *See Goff*, 35 P.3d at 495.

◼ Nevertheless, the readmission process itself recognizes that no offense "is so grave that a disbarred attorney is automatically precluded from attempting to demonstrate through ample and adequate proofs, drawn from conduct and social interactions, that he has achieved a 'present fitness,' to serve as an attorney and has led a sufficiently exemplary life to inspire public confident [sic] once again, in spite of his previous actions." *Avila*, 52 P.3d at 235, citing *In re Kone*, 90 Conn. 440, 442, 97 A. 307 (1916) and *In the Matter of Allen*, 400 Mass. 417, 509 N.E.2d 1158, 1160–61 (1987). "Rehabilitation . . . is a 'state of mind' and the law looks with favor upon rewarding with the opportunity to serve, one who has achieved 'reformation and regeneration.'" *Id., citing March v. Committee of Bar Examiners*, 67 Cal.2d 718, 732, 63 Cal.Rptr. 399, 433 P.2d 191 (1967).

◼ Petitioner has offered his own testimony, that of his family, and other attorneys, regarding his remorse over his prior actions, his efforts to face his ethical and personal issues, and his efforts to stay connected with the legal profession in ways other than practicing law.

Petitioner sought counseling through the Church of Scientology's auditing process, which helped him confront his business and personal issues, and eventually bring his trust account back into balance. He took training to become an auditor himself, taking many classes in ethics. By November 1991, he had repaid all of his clients, with interest, and all costs were repaid by January 1992.

Petitioner recognizes that the stressors of financial difficulties and poor relationship choices led to his mental breakdown. He has made arrangements to call on a therapist should he need to talk about mental health issues. The Hearing Board accepts the opinion of Dr. Wahl that Petitioner's psychological condition should be monitored for at least the beginning of his readmission, due to the moderate probability of relapse.

Recognizing that he may end up in a solo practice following readmission, Petitioner has consulted with an attorney in good standing to act as a practice monitor. The Hearing Board finds that James F. Pamp understands the seriousness of such a position, and is impressed with the careful thought he gave to the position before agreeing to undertake it.

These facts convince the Hearing Board by clear and convincing evidence that Petitioner understands that he must seek help when he becomes overwhelmed by practice responsibilities or financial pressures, and cannot take client funds to satisfy personal obligations. Because he has demonstrated that change in character, the Hearing Board finds that he is rehabilitated.

Petitioner's passage of the Colorado Bar Examination and the Multistate Professional Responsibility Examination establishes his competence to practice law. By stipulation, the Office of Attorney Regulation Counsel has agreed that Petitioner has substantially complied with all disciplinary orders.

Although not controlling in this readmission proceeding, it is important to note and significant to the Hearing Board that at the conclusion of all testimony in this proceeding that Ms. Funk, the Assistant Regulation Counsel, stipulated that Petitioner should be readmitted to the practice of law.

The Hearing Board therefore grants Petitioner's petition for readmission. As a condition of his readmission, Petitioner's practice shall be monitored by James F. Pamp [9], who will report to the Office of Attorney Regulation at least every six months regarding the

status of Petitioner's client trust accounts and client files for a period of one year following readmission.

As a further condition of his readmission, Petitioner will consult with a psychotherapist satisfactory to both Petitioner and the People every six months for one year following readmission.

### V. ORDER

1. The Hearing Board **GRANTS** the Verified Petition for Readmission filed by Petitioner Thomas Richard Lefly. Petitioner **SHALL** contact the Office of Attorney Registration within twenty (20) days of the date of this order and comply with all necessary conditions of readmission required of a "newly admitted attorney" which include the payment of registration fees, completion of requisite paperwork, obtaining a new attorney registration number, and appearing before the Presiding Disciplinary Judge to take the oath of admission. The Court will issue an "Order and Notice of Readmission Pursuant to C.R.C.P. 251.29(a)" upon Petitioner's successful compliance with the above conditions.

2. James F. Pamp, or another practice monitor satisfactory to the People, **SHALL** monitor Petitioner's practice and trust accounts every six months for a period of one year.

3. Petitioner **SHALL** consult with a psychotherapist satisfactory to Petitioner and the People every six months for a period of one year.

4. Petitioner **SHALL** pay the costs of these proceedings. The People **SHALL** submit a Statement of Costs within fifteen (15) days of the date of this Order. Petitioner shall have ten (10) days thereafter to submit a response thereto.

9. If Mr. Pamp is unable to fulfill his responsibilities, another monitor satisfactory to Petitioner and the People may be selected.